Sherman H. SKOLNICK, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below),

and

Saul I. Ruman and Richard J. Lesniak,
Appellees (Intervenors Below).

No. 3–1076A233.

Court of Appeals of Indiana,
Third District.

Oct. 25, 1979.

Sherman H. Skolnick, Chicago, Ill., for appellant.

Theodore L. Sendak, Atty. Gen., Alembert W. Brayton, Deputy Atty. Gen., Indianapolis, Saul I. Ruman, Hammond, for appellee.

STATON, Judge.

On July 29, 1975, in an eight-page order of the Porter Superior Court, Sherman H. Skolnick was convicted three times of direct criminal contempt. For each conviction Skolnick was sentenced to thirty days' incarceration in the Porter County Jail and fined $100.00. Skolnick contends that the three direct contempt convictions are invalid because:

 I. he was denied due process of law;

 II. the trial judge was without jurisdiction to convict Skolnick of direct contempt;

 III. the convictions abridged Skolnick's right to freedom of speech;

 IV. the trial judge erred in permitting Ruman and Lesniak to intervene in Skolnick's case;

 V. the trial judge was biased against Skolnick.

Having examined the issues presented, we affirm two of the direct contempt convictions and reverse one of them.

The present appeal concerns three of six direct contempt convictions against Skolnick in the Porter Superior Court during July of 1975. We have already addressed and disposed of the three other contempt convictions: *Skolnick v. State*, PSC 354 (1979), Ind.App., 388 N.E.2d 1156, wherein we affirmed his two direct contempt convictions of July 16, 1975, and *Skolnick v. State and Ruman and Lesniak*, PSC 356 (1979), Ind.App., 388 N.E.2d 1156, wherein we affirmed a conviction for direct contempt occurring July 21, 1975. The facts necessary for a determination of the instant case are as follows:

Skolnick filed in the Porter Superior Court on July 25, 1975, a motion for reconsideration of his July 21, 1975 direct contempt conviction. Skolnick also filed a pleading entitled "Motion to Strike and Expunge," in which he sought to strike two pleadings and two court orders relating to earlier direct contempt proceedings against him. In Paragraphs Four and Five of this latter pleading, Skolnick charged that the trial judge and local attorney Ruman sought to "connive and confederate" against Skolnick in order to cover up their alleged corruption in two earlier, unrelated cases.

On July 28, 1975, the trial judge set Skolnick's motions for hearing on July 29, 1975. Skolnick was notified of the date and time of the hearing. On July 29, Skolnick filed a pleading entitled "Motion to Submit Previous Motions Without Oral Argument." The substance of this motion was as follows:

"1. Nothing said herein constitutes a waiver of anything said in two previously filed Motions of defendant Skolnick.

"2. On July 28, 1975, in the afternoon, while near the courthouse a deputy sheriff handed Skolnick a paper stating 'The Court now sets this matter for hearing on July 29, 1975, at 2:00 p. m.'

"3. Recently, Judge Alfred J. Pivarnik has twice previously taken advantage of

Skolnick's presence in Pivarnik's courtroom to falsely imprison Skolnick, without specific charges made or legal requirements as specified by Burns 34–4–7–7 (3–907) [IC 1971, 34–4–7–7 (Burns Code Ed.)]. Skolnick believes it is unsafe for him to further physically be present in Judge Pivarnik's courtroom—that Pivarnik intends to further falsely imprison Skolnick, all to be done by Pivarnik under the sham and pretense of legal proceeding, without authority or jurisdiction, and in violation of Skolnick's rights, privileges, and immunities, made actionable under the Federal Civil Rights acts, 42 U.S.C.A. Sec. 1983, et seq.'

"4. Trial Rule 73(A) provides for the submission of motions without requiring oral argument or the physical presence of the person so submitting said motions.

"5. To prevent further false imprisonment of himself, Skolnick submits the said heretofore Motions filed by him, without oral argument or his physical presence in the courtroom of Judge Pivarnik, or other oral hearings.

"WHEREFORE, Skolnick, defendant, pro se, moves as aforesaid and demands equal justice as provided by the state and federal constitutions.

s/ Sherman H. Skolnick, defendant
pro se 9800 So. Oglesby,
Chicago, ILL. 60617"

The July 29 hearing on these motions proceeded in Skolnick's absence. During the hearing the trial judge found Skolnick in direct contempt three times for (1) contumacious statements made in his motion to strike and expunge; (2) contumacious statements made in his motion to submit previous motions without oral argument; and (3) Skolnick's part in certain allegedly contumacious activities. These findings were reduced to writing in an order dated July 29, 1975:

"STATE OF INDIANA ⎫
⎬ SS:
"COUNTY OF PORTER ⎭

IN THE PORTER SUPERIOR COURT

CONTINUOUS TERM, 1975

"STATE OF INDIANA

VS.

"ROBERT SKAGGS, et al.

CAUSE NO. 75–PSC–1233

"ORDER OF COURT

"Hearing is opened on Motion of Sherman Skolnick for a re-hearing and reconsideration of finding of said Sherman Skolnick guilty of direct contempt of this Court on Monday, July 21, 1975, and fixing punishment.

"Also to be heard at this hearing pursuant to notice to all parties are Defendants Motion to Strike and Expunge pleadings.

"Defendant Sherman Skolnick files Motion to Submit Previous motions without Argument.

"The Sheriff of Porter County files return showing service of notice of hearing on Sherman Skolnick. Defendant Sherman Skolnick fails to appear for this hearing and requests by written motion heretofore filed that the Court rule in his absence.

"The Court now denies all relief sought by Defendant in his motion for reconsideration and re-affirms its Judgment of July 21, 1975, finding the Defendant in direct contempt of this Court and sentencing him to the Porter County Jail for a period of 24 hours.

"Defendant's Motion to Strike is denied in all specifications.

"The Court in open court now takes notice of its own record and finds:

"1. That Sherman Skolnick filed a pleading in this cause on July 25, 1975, entitled 'Motion to Strike and

Expunge' the following pleadings and orders:

"1. Petition to intervene pursuant to Trial Rule 24.

"2. Order and Judgment granting intervention.

"3. Motion to Quash subpoena issued by Sherman Skolnick to Richard Lesniak and Saul I. Ruman on Sunday, July 20, 1975, and for expenses and Attorneys fees; and

"4. Order and Judgment Quashing subpoenas pursuant to Trial Rule 45.

"2. That paragraph four (4) and five (5) of said pleading as pages two (2) and three (3) state as follows:

"Paragraph four (4): Hammond Attorney Saul I. Ruman and East Chicago Attorney Richard Lesniak had been subpoenaed by defendant to produce evidence, oral and documentary, in support of defendant's opinions as to the corrupt and improper activities of Judge Alfred J. Pivarnik as Special Judge to Lake County Causes *Edward L. C. Broomes vs. City of East Chicago*, Lake Superior Court Room Number Five, Cause No. 574–2139, *Bryant et al. vs. Board of County Commissioners*, Lake Circuit Court Cause Nos. C–71–1384 and C–71–1560. Saul I. Ruman was one of the principals in the fraudulent conspiracy widely known as the Apple Valley Village Fraud. In addition, Saul I. Ruman had been active in the procurement of a decree in the City of East Chicago case, supra, undertaking to 'whitewash' a corrupt group of city officials in East Chicago and some contractors from Milwaukee, Charles Zordani, Solomen Sidel, and Laurence Bursten, the latter being under indictment in the Lake Criminal Court for fraudulent and criminal misconduct in procuring a four-and-one-half million dollar public contract with the Park Board of the City of East Chicago. Richard Lesniak is a partner in the East Chicago, Indiana lawfirm [*sic*] of Given, Dawson & Cappas. Rudolph Val Dawson, a partner in the East Chicago lawfirm [*sic*], is Chairman of the Disciplinary Commission of the Supreme Court of Indiana. The Commission has sole and exclusive jurisdiction over charges of misconduct on the part of Indiana State Court Judges as well as all members of the legal profession. On recent date, Ben Lesniak, brother of Richard Lesniak, was indicted by a Federal Grand Jury for criminal offenses growing out of his activities as Chairman of the East Chicago Housing Authority. The lawfirm [*sic*] of Given, Dawson & Cappas acted and presently act as attorneys for the East Chicago Hosing [*sic*] Authority, receiving substantial fees from bond issues issued in the name of the City of East Chicago to finance public housing projects. Paragraph five (5): Without any authority, legal or otherwise, to represent the State of Indiana or the people of Porter County in respect to the prosecution of criminal offenses occurring in Porter County, Indiana, including charges of direct criminal contempt, said Saul I. Ruman undertook to intervene and usurp the office of Prosecuting Attorney, connive and confederate with Judge Pivarnik during the noon hour with a view and purpose of reaching an agreement as to a plan and scheme to abort any investigation into the charge of corruption and judicial impropriety urged by the defendant, procured the production of defendant in the Court room where he, Ruman, undertook to assail and impugn the character and integrity of defendant with vile, scurrilous and false characterizations and epithets, all with the malicious, improper and unprecedented motive and intent to discredit defendant as chairman of the Citizens Committee to Clean Up the Courts. Saul I. Ruman, on July 20, 1975, when he was

served had severe misgivings with reference to the possibility that his unprecedented corrupt conduct in the East Chicago case, the Apple Valley Village fraud, and other notorious swindles and frauds would be exposed.

"3. That said statements charge this court with connivance, conspiracy and improprieties so apparent in their content that further explanation herein is unnecessary.

"4. That said charges are made to influence and intimidate this court in decisions pending before the court including but not linited [sic] to the very pleading that contains them.

"5. That said statements represent a continuous purposeful and malicious attack by the Defendant on this court to embarrass and demean it in the community so as to frustrate the ability of the Court to effectively serve in its judicial capacity.

"6. That such conduct of the Defendant is a direct and criminal contempt of this Court.

"The Court now finds the defendant guilty of a direct criminal contempt of this court and finds as punishment therefore [sic] that he be sentenced to the Porter County jail for a period of thirty days and that he be fined in the sum of $100.00. Bond is set at $5,000.

"The Clerk is ordered to issue a warrant to the Sheriff of Porter County for the arrest of said Defendant forthwith.

"The Court further finds:

"1. That the Defendant filed a pleading in this cause on this date July 29, 1975, entitled 'Defendant's Motion to Submit Previous Motions without Oral Argument.'

"2. That said pleading charges the Court with an intent to falsely imprison him under a sham and pretense of legal authority. That said pleading contains charges against the Court of improprieties so apparent in their content that further explanation is unnecessary.

"3. That said statements represent a continuous purposeful and malicious attack by the Defendant on this court to embarrass and demean it in the community so as to frustrate the ability of the Court to effectively serve in its judicial capacity.

"4. That such conduct of the Defendant is a direct and criminal contempt of this Court.

"The Court now finds the defendant guilty of a direct criminal contempt of this court and finds as punishment therefore [sic] that he be sentenced to the Porter County jail for a period of thirty days and that he be fined in the sum of $100.00. Bond is set at $5,000.

"The Court further finds:

"That an affidavit of one Elmer L. Jacobsen was filed in this cause attached to Sherman Skolnick's "Motion for Reconsideration and entitled, 'Affidavit of Elmer L. Jacobsen In Support of Motion Under Burns Indiana Statutes Annotated Code Edition, Title 34, Section 34-4-7-7 (3-907) By Way of Exception to the Opinion and Judgment of the Court and for a Reconsideration of its Opinion and Judgment of the Court and for a Reconsideration of its Opinion and Judgment of the Case.'

"That said affidavit states that affiant observed Alfred J. Pivarnik, the regular judge of this court, and Attorney Saul I. Ruman leave the Courthouse and go to the Old Style Restaurant and later return to the Courthouse.

"That said affidavit suggests that the judge and attorney Ruman spent the noon hour together.

"That affiant knew full well the judge and attorney Ruman did not spend the noon hour together.

"That Judge Alfred J. Pivarnik was accompanied by the Sheriff of Porter County and one of his deputies for the purpose of personal protection and no other persons going and coming from lunch such facts being substantiated by four affidavits in

this record and obviously in the knowledge of the judge.

"That said affidavit was filed with and in support of pleadings stating that this court connived and conspired with Attorney Saul I. Ruman during the noon hour.

"That it appears to the Court that said affidavit was filed to aid and abet Sherman Skolnick in influencing and intimidating the Court in reaching a decision in the matters before it including but not limited to the pleading to which it was attached.

"That said affidavit was filed to aid and abet Sherman Skolnick in embarrassing and demeaning the Court in the community and render it ineffective in its judicial duties and prevent and hinder it from reaching fair and impartial decisions.

"That the Court attempted to call Elmer L. Jacobsen as a witness to inquire of him as to his conduct but that he was not present in Court at the hearing nor could he be found in the Courthouse.

"Wherefore, the Court orders the Clerk to issue a citation to the affiant Elmer L. Jacobsen ordering him to appear at a hearing to be had on the 1st day of August, 1975, at 2 o'clock p. m.; and show cause why he should not be held in direct contempt of this Court.

"The Court further finds that Sherman Skolnick, Alex J. Bottos and David Glenn Hoffman as officers of the Citizens Committee to Clean up the Courts have cause to be printed a one page scurrilous and defamatory statement captioned 'Padlock Pivarnik' an original of which is attached hereto.

"That Alex J. Bottos, as representative of this group was granted a permit by the City of Valparaiso to have a 'protect demonstration prade [sic]' on Monday, July 28, 1975, Tuesday, July 29, 1975, and Wednesday, July 30, 1975, at the hours of 12:30 p. m. until 2:30 p. m.

"That said demonstration did take place on Monday July 28, 1975, and was in progress during the time this cause was being heard from 2:00 p. m. until 3:30 p. m. on July 29, 1975.

"That these statements or leaflets were passed out by these persons or caused to be passed out by them and other persons unknown to this Court on the sidewalks surrounding and approaching the courthouse housing this Court. That copies of these leaflets were given to members of the public using the sidewalks and members of the public having business with the courts and other court house offices.

"That copies of these leaflets found their way into the Court room during the hearing of this cause and into the chambers of the judge during this hearing.

"That one of the 'charges' on these leaflets refers to this matter now under consideration by the Court and being heard by the Court at the very time, a fact well known to these persons.

"That all charges are scurrilous, false, untrue, purposeful and malicious attacks on this Court printed and published for the sole purpose of embarrassing and harassing this court so as to bring it into disrepute in the community and render it ineffective in its judicial capacity.

"That this activity is part of an avowed scheme and plan of these persons and others in concert with persons known and unknown to this court to demean this Court to the extent that it is rendered completely ineffective and is virtually shutdown.

"That these persons have caused a 'hotline' to be published on the telephone lines of a published number in Lake County in the City of Gary, 20 miles from this Court in which Alex Bottos speaks and charges the Judge of this Court as being corrupt in so many ways and instances that space does not permit their repetition. That the home telephones [sic] numbers of the Judge, the Sheriff, several attorneys, the Supreme Court of Indiana an [sic] others are published.

"That it is necessary for this judge to have a telephone in his home a [sic] available to the public for the purpose of issuing emergency process in Child Wardship, search warrants and other causes.

"That this Judge and his family have had over 100 calls on a 24 hour basis threatening and harassing not only this Judge but members of his family. That an example of some of these calls has been that the Judge's teen age [sic] son, Timothy was told 'hooded mobs' will drag your crooked father and all of you out of your home.

"That this Judge's wife, Catherine Pivarnik, was told 'we are out for your husband and we are going to get him.'

"That it has been necessary for the General Telephone Company of Indiana to particularly audit the Judge's home telephone and attempt to trace these calls.

"That calls were traced out of the area of the Judge's home to Crown Point, Indiana, South Bend, Indiana and Chicago, Illinois.

"That this Judge was assaulted by David Glenn Hoffman in concert with Alex Bottos, Sherman Skolnick and others totalling approximately twelve persons at which time and on the second floor of the courthouse while this Judge was talking about courthouse business with the County Commissioners the said David Glenn Hoffman pushed a camera within an 'inch or two' of the Judge's nose pretending to take a picture of him. That after repeatedly doing this, he was asked repeatedly to leave by the Judge but refused to do so. That it was necessary for the Judge to push the camera away and at that instant all of said persons surrounded the Judge and accused him of assaulting David Glenn Hoffman and threatened and taunted the Judge in the presence of members of the public and employees and officer holders of the courthouse.

"That it was necessary to call the Sheriff and he and several deputies came to the scene to restore order.

"That these persons then went to the office of the Prosecuting Attorney and demanded the arrest of this Judge for assault.

"That members of this group called the news media and reported that the Judge struck a camera man without cause.

"That they were so abusive to the staff of the Prosecuting Attorney that it was again necessary for the Sheriff to come there and restore order.

"That on July 7, 1975, while this Judge was sitting at a table with several members of the Bar in a public restaurant in this city, one attorney Glenn Moody, a confederate of these persons approached this Judge and in a threatening manner verbally abused him in a loud manner until the owner of said restaurant physically removed the said Glenn Moody from the premises.

"That the activities as above set out and others so extant in the community as to be common knowledge to this Judge as a member of said society is the topic of conversation in the entire community and is reported in the press and on radio releases daily.

"That it is necessary for the Sheriff of Porter County to provide armed protection for this judge during each day including lunch breaks.

"That indeed this Court is under seige [sic]!

"That a great and increasing amount of time is taken by thie Court and the ofrices of the Sherifr, County Clerk, Prosecuting Attorney and all law enforcement personnel to respond to these people [sic]

"That so much of this Court's time and attention are taken by these persons and their activities that this Court is all but shutdown and unavailable for the other members of this community to judicially serve them.

"That an emergency exists and this court must act to preserve its very exixtance [sic] as an effective judicial institution.

"The Court finds that the distrubution [sic] of these leaflets as a pretense at 'peaceful demonstration' at the very dorrs [sic] of this courthouse interrupts and interreres [sic] with the operation of the Court in this and other manners.

"The Court finds that said distribution of these leaflets at the very doors of the courthouse is being done to purposely embarrass and demean this Court in the community so as [to] render its judgments ineffective.

"The Court finds that Alex J. Bottos, Sherman Skolnick and David Glenn Hoffman and each of them is guilty of a direct contempt of this Court for the above reasons and the Court orders that each of them as punishment therefore [sic] be confined in the Porter County Jail for a period of 30 days and fined in the sum of $100.00.

"The Clerk is ordered to issue a warrant to the Sheriff of Porter County for each of said persons for their immediate arrest in execution of this judgment. Bond for each of said persons is set at $5,000.00.

"The Court further orders that the Sheriff of Porter County and his County Police Officers and any and all other peace officers of this state take into custody all persons distributing or attempting to distribute these leaflets in or about the premises of the Porter County courthouse and immediately bring them before this Court.

"This order is not meant to be nor is it to be interpreted to be an order to stop or in any way interfere with any peaceful demonstration, protest or parade by any citizens.

"ALL OF WHICH IS ORDERED, ADJUDGED AND DECREED this 29th day of July, 1975.

s/ Alfred J. Pivarnik
Alfred J. Pivarnik, Judge
Porter Superior Court"

We must first determine whether Skolnick's conduct amounted to direct contempt, for although we accept as true statements entered of record by the trial court of the matters constituting the contempt, we also examine the record, if necessary, to determine "whether the acts alleged to be contemptuous do, in fact, constitute acts of contempt." *State ex rel. Stanton v. Murray* (1952), 231 Ind. 223, 235, 108 N.E.2d 251, 257.

Direct contempt is an act which disturbs or interrupts court proceedings during the time a court is in session. *McIntire v. State* (1967), 248 Ind. 142, 223 N.E.2d 347. The offense deals primarily with the maintenance of order in the courtroom. *Id. See also* IC 1971, 34-4-7-1, 34-4-7-2 (Burns

Code Ed.). Indiana courts, under their inherent power to convict and punish for contempt, have established as well that one may be guilty of direct contempt for filing in open court a pleading containing contumacious statements or materials. *LaGrange v. State* (1958), 238 Ind. 689, 153 N.E.2d 593; *Kerr v. State* (1923), 194 Ind. 147, 141 N.E. 308; *Matter of May* (1976), Ind.App., 358 N.E.2d 138.

Skolnick's "Motion to Strike and Expunge" and "Motion to Submit Previous Motions Without Oral Argument" were both filed in open court and were within the knowledge of the trial judge. The motion to strike several times alleged corrupt and improper behavior of the trial judge. The motion to submit previous motions charged that the trial judge falsely imprisoned Skolnick; that the trial judge intended to do so again "under the sham and pretense of legal proceeding;" and, that the trial judge violated Skolnick's rights under the Federal Civil Rights Act. The contumacious nature of these allegations in the pleadings is wholly apparent. As the Indiana Supreme Court wrote in *Grimm v. State* (1959), 240 Ind. 125, 162 N.E.2d 454:

"So long as critics [of court] confine their criticism to facts and base them upon the decisions of the court they commit no contempt no matter how severe the criticism may be; but when they pass beyond that line and charge that judicial conduct was influenced by improper, corrupt or selfish motives, or that such conduct was affected by political prejudice or interest, the tendency is to poison the foundation of justice and create distrust, and destroy the confidence of the people in their courts."

240 Ind. at 127, 162 N.E.2d at 456, *quoting Ray v. State* (1917), 186 Ind. 396, 404, 114 N.E. 866, 869.

The trial judge's order, as it relates to the third direct contempt conviction, specifies numerous actions allegedly taken against the trial judge by Skolnick and his associates. But the conviction seems to have resulted primarily from the publication and distribution of leaflets containing scurrilous statements directed at the trial judge:

# PADLOCK PIVARNIK !

**JUDGE PIVARNIK**

IMPEACH JUDGE ALFRED J. PIVARNIK

CROOKED JUDGES ARE UN-AMERICAN

......because all our rights and freedoms are designed to be protected and upheld in the courts by a fair, moral, and impartial judge, or panel of judges, who make decisions only after hearing the facts by both parties in a suit. A court that condemns and judges and imprisons before it hears, is not a court. The dictionary says a criminal "is he who breaks the law".

| THE LAW SAYS.......................... | YET, JUDGE PIVARNIK DOES.............. |
|---|---|
| **1.** Indiana Trial Rule 76(1) says a judge must grant a change of venue or change of judge when requested and must make no further decisions in the case. | **1.** ...repeatedly rules and gives judgments against victims after they have legally filed for change of judge or change of venue. (See record in case of Portage National Bank vs. Robert Skaggs, et al., No. 75-PSC-1233.) |
| **2.** Indiana Statutes state (Title 34-4-7-7) no judge can imprison any citizen for direct contempt except after setting forth specific charges and allowing the person so accused to make a statement in response thereto, and the person has a right to post bail and appeal......... | **2.** ...throws people in jail, without any specific charges, without any hearing, refuses to hear evidence, and kills legally acquired subpoenas because it would bring out evidence of Pivarnik's corruption, and refuses bail....all as required by law. (See record in State of Indiana vs. Sherman H. Skolnick, part of 75-PSC-1233.) (As to imprisonment prior to trial, see case involving two ministers of Fairhaven Church.) |
| **3.** A corrupt judge is one who participates in a fraud upon the court in which he sits. (See, for examples, cases mentioned in "The Corrupt Judge", by Joseph Borkin, pages 97-137, published 1962, by Clarkson N. Potter, Inc., New York.) A judge has no authority to hear and determine a suit brought by collusion--where both sides are really the same, and the suit is brought to defraud the public. | **3.** ...Pivarnik knew, or had reason to know, that the Apple Valley Village case was a fraud upon his court--a forbidden, illegal, collusive suit designe. by both sides to silence thousands of citizens protesting sub-standard property development.(Case No. C71-1560, Lake County, Indiana,Circuit Court Pivarnik, as special judge, knowingly handled another collusive suit, involving Metro Construct. Co. and the East Chicago Park Board--designed to whitewash a city contract given without formal bid (No.574-2139, Lake County Superior Court, Room Number Five, Hammond, Indiana.) |
| **4.** Judicial Ethics forbid a judge from making public comments on a pending case. | **4.** ...Judge Pivarnik repeatedly releases to the press, prejudicial, vile, and false statements--- prejudicing the rights of litigants and making a fair and impartial hearing and ruling difficult if not impossible. (See, for example, case of two ministers of Fairhaven Church.) |

PREPARED AND PRINTED BY THE CITIZEN'S COMMITTEE TO CLEAN UP THE COURTS
9300 So. Oglesby Ave., Chicago, Ill. 60617. Also, P.O. Box 1788, Gary, Indiana.
(312) 375-5741, afternoons and evenings. Answering service: (312) 787-8220.
HOTLINE NEWS, on 24 hours a day: (312) 731-1100, in Chicago. (219)980-2404, In Gary,Ind.
Chairman: Sherman H. Skolnick Chief Investigator: Alex J. Bottos
Researcher: David Glenn Hoffman

In his order the trial judge found that circulation of these leaflets in the area surrounding the Porter County Courthouse "interrupts and interferes with the operation of the Court in this and other manners," and was "being done to purposefully embarrass and demean this court in the community so as to render its judgments ineffective." None of the leaflets were filed with the court or within pleadings submitted to the court; rather, the trial judge recited in his order that "copies of these leaflets found their way into the Court room during hearing of this cause and into the Chambers of the judge during this hearing." Since these leaflets were not filed with the court or inserted into pleadings filed, their publication and distribution cannot be punished by direct contempt. Summary proceedings for direct contempt

are inappropriate when the alleged contempt is through ordinary publication.

■ In *LaGrange v. State* (1958), 238 Ind. 689, 153 N.E.2d 593, the Indiana Supreme Court addressed the issue whether an allegedly contumacious radio broadcast could be punished by direct contempt. The Court observed that conduct is directly contemptuous when it takes place in or immediately adjacent to the courtroom and while the court is in session, "so that the judge has personal knowledge of such conduct in his official capacity." 238 Ind. at 694, 153 N.E.2d at 596. The misconduct constituting the offense must be directly applied or communicated to the trial judge "in a manner different than the general public." 238 Ind. at 695, 153 N.E.2d at 596. The Court analogized the radio broadcast in *LaGrange* with an allegedly contemptuous newspaper article in *State ex rel. Stanton v. Murray* (1952), 231 Ind. 223, 108 N.E.2d 251, wherein a direct contempt conviction was reversed. In ruling that summary conviction and punishment for direct contempt is improper when the contempt is through ordinary publication, the Court in *LaGrange* examined the rationale for this principle in light of radio broadcasts and newspaper publication:

> "In both instances the act alleged to be contemptuous takes place away from the courtroom. Therefore, there is no greater likelihood of physical disturbance of court proceedings nor to coerce or influence a decision in the case; and statements made are, in each instance, widely disseminated to the general public. In either instance the judge may obtain personal knowledge of the conduct, through reading the newspaper or hearing the radio broadcast. We see no reason for applying a different rule to radio stations than is applied to newspapers, since each is a form of publication with substantially similar purposes—to inform and, possibly, influence the public."

238 Ind. at 696–97, 153 N.E.2d at 597–598. We believe that the leaflets in the instant case fall within the ordinary publication rule as well.

The trial judge's order of July 29, 1975 indicates that the leaflets were distributed to members of the public in the area surrounding the Porter County Courthouse. There was no showing that the leaflets precipitated physical obstruction of courtroom proceedings. Since direct contempt deals primarily with the maintenance of order in the courtroom, *McIntire v. State, supra,* we consider it unwise to extend the bounds of the offense to any abusive publication, not filed in court, which "finds its way" into open court or into a judge's chambers. The potential for abuse in such a ruling is obvious, and it would conflict with the directive of the Supreme Court of the United States that the summary contempt power must be limited to "the least possible power adequate to the end proposed." *In re Michael* (1945), 326 U.S. 224, 227, 66 S.Ct. 78, 79, 90 L.Ed. 30. Any contempt action pursued in the instant circumstance should have been one for indirect contempt. *LaGrange, supra; State ex rel. Stanton, supra.* As reprehensible and scurrilous as the leaflet is, its distribution outside of the courthouse and its unexplained presence in the courtroom and trial judge's chambers does not constitute direct contempt.

■ Furthermore, as indicated *supra,* the trial judge's order specifies other abusive acts allegedly committed by Skolnick and his associates against the trial judge. Although it is impossible to measure the extent to which these activities were considered in the third contempt conviction, we note that many of them were allegedly committed outside of the courtroom and courthouse. Some of the acts appear to have been committed over a period of days. The activities mentioned are certainly abusive of the trial judge; yet their remoteness from "matters in or adjacent to the courtroom," *LaGrange, supra,* renders them unsupportive of a conviction for direct contempt. In reversing the direct contempt conviction in *State ex rel. Stanton v. Murray, supra,* the Indiana Supreme Court reviewed the trial judge's contempt order. The Court concluded from the order that in

convicting the defendant of direct contempt the trial judge,

"considered matters which occurred not only out of the presence of the court but which occurred outside of the building in which court was being held, and at a time thirteen days prior to the date on which appellant was found guilty."

231 Ind. at 239, 108 N.E.2d at 258. Accordingly, we must reverse the third direct contempt conviction.

We proceed to examine Skolnick's further allegations, which he submits warrant reversal of his convictions.

## I.

### Due Process

Skolnick alleges myriad due process violations which he incurred through his contempt convictions. Some of those alleged involve his prior direct contempt convictions of July 16, 1975 and July 21, 1975. As we have examined and disposed of these in Skolnick's other appeals [1], we need not respond to them again.

Skolnick's due process allegations relating to the present appeal concern the trial judge's use of summary process in convicting him. He also asserts that his absence from the July 29 hearing on his motions renders his convictions invalid.

 As discussed *supra*, the filing in open court of pleadings containing contumacious statements or materials is direct criminal contempt. *LaGrange, supra; Kerr, supra.* Conviction and punishment for it involve a summary procedure; it contemplates that immediate action must be taken to restore order and respect in the courtroom. *Brennan v. State* (1961), 242 Ind. 79, 173 N.E.2d 312. No charges need be filed, nor must the court proceed to a trial of the matter. IC 1971, 34–4–7–7 (Burns Code Ed.). Direct contempt may be punished immediately upon its occurrence, without further proof or examination beyond what is known to the presiding judge

by his senses. *Brennan, supra; Coons v. State* (1922), 191 Ind. 580, 134 N.E. 194.

As we have ruled that the statements in Skolnick's motions amounted to direct contempt, we conclude that the trial judge's use of summary direct contempt procedure was entirely proper.

Moreover, Skolnick's absence from the July 29 hearing does not invalidate the contempt convictions. His "Motion to Submit Previous Motions Without Oral Argument" indicates that his absence from the proceeding was voluntary. It in no way related to the conduct for which he was convicted, that is, the filing of the pleadings and their content. One may be guilty of direct contempt despite one's absence from the courtroom. *Coons v. State, supra,* 191 Ind. at 593, 134 N.E. at 198.

## II.

### Jurisdiction

 Skolnick contends that the trial judge was without jurisdiction to convict him of direct contempt, since the trial judge disqualified himself from the case of *Portage National Bank v. Skaggs* [2], wherein Skolnick's first two convictions arose on July 16, 1975. His argument has no merit. A criminal contempt action is a proceeding separate and independent of the action from which it arose. *Allison v. State ex rel. Allison* (1963), 243 Ind. 489, 187 N.E.2d 565. This principle applies to direct as well as indirect contempt proceedings. *Matter of May, supra.*

 Since a criminal contempt proceeding is a separate action, its jurisdiction is independent of any other cause or action. *Allison, supra.* Thus, Skolnick's contempt convictions amounted to separate causes, each independent of the original *Skaggs* action. Furthermore, even the fact that a trial judge may be precluded from hearing a particular case does not eliminate his power to cite an individual for direct contempt. *Allison, supra; Matter of May, supra.*

---

1. *See Skolnick v. State*, (1979), Ind.App., 388 N.E.2d 1156.

2. No. 75–PSC–1233. *See Skolnick v. State, supra.*

### III.

### Freedom of Speech

■ Skolnick's claim that his right to freedom of speech was abridged concerns principally that conviction based on the publication and distribution of the leaflets. Because we have reversed that conviction on other grounds, we need not consider the freedom of speech claim. Additionally, we note that Skolnick's First Amendment guarantees do not extend to contumacious statements, oral or written, in open court. *See State ex rel. Stanton v. Murray, supra; Matter of May, supra.*

### IV.

### Intervention

In *Skolnick v. State and Ruman and Lesniak, supra*, we considered the propriety of the trial judge's action in allowing Ruman and Lesniak to intervene in proceedings concerning Skolnick's July 16 contempt case. In concluding that the intervention and the appearance of Ruman as amicus curiae was error, we ruled that intervention, permissive or otherwise, was improper in a criminal case, especially one such as direct contempt, which concludes in essence upon summary conviction and punishment.

■ In applying the principles of the earlier case to the present appeal, we conclude that the trial judge committed error in allowing intervention and appearance of *amicus curiae*[3] in these later proceedings against Skolnick. In the present appeal this error is exacerbated, since Ruman and Lesniak have only expressly been granted permission to appear in the original contempt action against Skolnick; they have not petitioned to intervene or appear in the present action, nor have they been granted

express permission in the form of a court order to do so. This is error; but, as we concluded in *Skolnick v. State and Ruman and Lesniak, supra*, the trial judge's error, in derogation of due process rights or other rights, will not work to void a direct contempt conviction, where the trial judge acts summarily in convicting and punishing the defendant. *See Illinois v. Allen* (1970), 397 U.S. 337, 346–47, 90 S.Ct. 1057, 25 L.Ed.2d 353; *United States v. Seale* (1972), 461 F.2d 345, 361–62.

### V.

### Bias

Skolnick submits that the trial judge's alleged bias against him mandates reversal of the direct contempt convictions. We disagree.

■ Direct contempt anticipates the need of the court to act summarily and swiftly to restore order in and respect for the court. *Brennan v. State, supra*. A trial judge is required to disqualify himself from presiding at a contempt proceeding only if he waits until the proceedings' end to cite for contempt occurring therein, or if the alleged contempt is of an indirect nature.[4] Since Skolnick's conduct in filing pleadings containing contumacious statements amounted to direct contempt, and the trial judge punished him immediately therefor, the trial judge was not bound to disqualify himself because of the possibility of bias.

We are aware that Skolnick and the trial judge were the principals in a lengthy dispute, that open hostility existed between the two, and that the trial judge incurred from Skolnick numerous abusive attacks under the benign guise of court reform. The better path would have been for the

---

3. The status of Ruman and Lesniak in the present appeal is vague. Ruman, on behalf of himself and Lesniak *as amicus curiae*, has submitted an appellate brief herein. Yet the record of proceedings in the present appeal designates them as intervenors below and appellees herein. Their vague status only reinforces our conclusion that their appearance in any of Skolnick's contempt cases was totally improper.

4. See IC 1971, 34–4–8–1 (Burns Code Ed.) (special judge provisions in indirect contempt cases); *Mayberry v. Pennsylvania* (1971), 400 U.S. 451, 91 S.Ct. 499, 27 L.Ed.2d 532 (trial judge has a duty to disqualify himself from contempt determination when he does not act instantly to cite for contempt); Fed.R.Crim.P. 42(b) (federal judge disqualification provisions for other than summary contempt cases.).

trial judge to have disqualified himself, after the initial contempt convictions of July 16, from presiding at any rehearing of the convictions. Nevertheless the record before us in the instant case clearly portrays the nature of the conduct for which Skolnick was convicted. That conduct is, on its face, directly contumacious.

We affirm those two convictions stemming from pleadings filed in the court. We reverse that conviction based on circulation of the leaflets.

Affirmed in part and reversed in part.

GARRARD, P. J., concurs with opinion.

BUCHANAN, C. J., (by designation) dissents with opinion.

GARRARD, Presiding Judge.

I adhere to my views expressed in *Jacobsen v. State* (1979), Ind.App., 384 N.E.2d 1041 concerning the use of amicus curiae and the point at which the judge before whom a contempt is committed must recuse himself from adjudicating a direct contempt. Otherwise I concur.

BUCHANAN, Chief Judge, dissenting.

### CASE SUMMARY

I respectfully dissent from the majority's opinion on two grounds:

*first,* this court lacks jurisdiction because of the defendant, Sherman Skolnick's (Skolnick) failure to file a timely motion to correct errors;

*second,* the acts constituting the third count of direct contempt were sufficient direct interference with the court's proceedings to warrant a citation for direct contempt.

### GROUND ONE

*CONCLUSION*—Skolnick failed to file a timely motion to correct errors and therefore this court has no jurisdiction over this appeal.

Although somewhat difficult to determine, in large part due to Skolnick's failure to make marginal notes in the record as required by Ind.R.Ap.P. 7.2(3)(A), the record reveals the following pertinent chronology:

July 29, 1975: Order issued citing Skolnick for three counts of contempt (the subject of this appeal), and setting bond on each count at $5,000 ($15,000 total).

July 30, 1975: Bench warrant issued for Skolnick's arrest.

August 27, 1975: The trial court issued an order finding: (1) That the Porter County Sheriff had informed the court that Skolnick had fled the court's jurisdiction into Illinois in order to avoid arrest. This was supported by Skolnick's attempt to file pleadings which were mailed from Chicago, Illinois, and Skolnick's statement over a "telephone hotline" that he was in Illinois to avoid the jurisdiction of the Porter Superior Court. (2) That the court would not entertain any pleas from Skolnick until he submitted himself to the jurisdiction of the court. (3) That the Porter County clerk was not to act on any pleadings attempted to be filed by Skolnick until further ordered by the Porter Superior Court.

September 26, 1975: Skolnick attempted to file his motion to correct errors, but it was not filed pursuant to the trial court's order.

May 5, 1976: On Skolnick's petition to the Court of Appeals for an order of mandate against the Porter Superior Court, a per curiam memorandum decision was issued giving Skolnick thirty days to submit himself to jurisdiction of the Porter Superior Court, and thereafter, sixty days to perfect his appeal.

July 12, 1976: The trial judge certified to the Court of Appeals that Skolnick had timely submitted himself to the jurisdiction of the Porter Superior Court by posting bond.

July 12, 1976: Skolnick's motion to correct errors was ordered filed.

July 29, 1976: Skolnick's motion to correct errors was overruled.

August 19, 1976: Skolnick's amended praecipe was filed.

Ind.R.Tr.P. 59(C) sets the mandatory limit for a timely filing for a motion to correct errors.

(C) When motion to correct errors must be filed. A motion to correct errors shall be filed not later than sixty [60] days after the entry of judgment.

Failure to file a motion to correct errors is jurisdictional—and this court must dismiss any appeal in which a motion to correct errors was not timely filed. *Lines v. Browning* (1973), 156 Ind.App. 185, 295 N.E.2d 853; *Bruner v. Terman* (1971), 150 Ind.App. 139, 275 N.E.2d 553. An extension of time for a motion to correct errors cannot be granted. *Lines v. Browning, supra.* Ind.R.Tr.P. 6(B). *See also State ex rel. Jackson v. Owen Circuit Court* (1974), 160 Ind.App. 685, 314 N.E.2d 73 (a trial court may not extend time deadlines by changing the date of judgment through nunc pro tunc entries).

An exception is made only in rare cases in which the appellant exercised due diligence and his late filing was in no way his fault, *see Soft Water Utilities v. LeFevre* (1973) 261 Ind. 260, 301 N.E.2d 745; *Costanzi v. Ryan* (1977), Ind., 368 N.E.2d 12. Skolnick's conduct could hardly be farther removed from the rule in *Soft Water Utilities.*

In *State ex rel. Ruetz v. LaGrange Circuit Court* (1972), 258 Ind. 354, 281 N.E.2d 106, our Supreme Court directly addressed the problem of a defendant who attempts to file a pleading while absenting himself from the court's jurisdiction in order to avoid its orders. Two points are clear. First, the time for filing a motion to correct errors is *not* tolled by a person's voluntary absence from the court's jurisdiction.

Second, a person voluntarily absenting himself from the court's jurisdiction *has no standing to file any plea* or ask any consideration from the court.

To allow a person to reserve unto himself the personal power to accept only a favorable determination would nullify the judicial process. *State ex rel. Ruetz v. LaGrange Circuit Court, supra; Michael v. Michael* (1969), Ind., 253 N.E.2d 261 (not printed in Indiana Reports); *Irvin v. State* (1957), 236 Ind. 384, 139 N.E.2d 898, *cert. den.* 353 U.S. 948, 77 S.Ct. 827, 1 L.Ed.2d 857; *Cornell v. Cornell* (1974), 160 Ind.App. 150, 310 N.E.2d 579.

Even without the trial court's order of August 27, 1975, Skolnick did not have standing to file his motion to correct errors with the clerk of the trial court.

Here Skolnick's decision to submit himself to the court's jurisdiction came nearly a year after he was cited and sentenced for contempt.[1]

Like Robert Frost looking down two paths, Skolnick had the option of choosing the road to appellate review or the road to Chicago. And as in the Frost poem, that choice made all the difference.

We cannot remake the decision for him. Nor can this court ignore the plain dictates of T.R. 59(C) which makes the timely filing of a motion to correct errors a *jurisdictional* requirement. To do other than follow the rule is to trump the Supreme Court's ace.

## GROUND TWO

*CONCLUSION*—The "leaflet" incident, when coupled with the surrounding circumstances, constituted a sufficient direct interference with the operation of the Porter

---

1. In a criminal proceeding, such as the criminal contempt involved in this case, a belated motion to correct errors is available under Rule PC 2 when a timely motion to correct error has not been filed. Under PC 2, however, the defendant must meet three requirements:

(a) no timely and adequate motion to correct error was filed for the defendant;

(b) the failure to file a timely motion to correct error was not due to the fault of the defendant; and

(c) the defendant has been diligent in requesting permission to file a belated motion to correct error under this rule.

Although not directly before this court at this time, it appears evident that Skolnick does not meet the second of these requirements. His failure to file a timely motion to correct errors was caused by his voluntary absence from the jurisdiction—a matter which was entirely his own fault.

Superior Court to merit a citation for direct contempt.

The majority opinion misperceives two important points. First, it wrongly characterizes the "Padlock Pivarnik" leaflets as within the ordinary publication rule. Second, it isolates this "leaflet" incident, and fails to put it in context with other events—events so baneful that they led the trial court to declare "That indeed this Court is under seige!"

"A direct contempt of court is an act committed in the presence of the court, *or so near thereto as to interrupt its proceedings,* while it is in session." (emphasis added) *State ex rel. Stanton v. Murray* (1952), 231 Ind. 223, 235, 108 N.E.2d 251, 257. Direct contempt deals primarily with the maintenance of order and respect in the courtroom, and in such areas adjacent thereto as are necessary for control for such purposes. *McIntire v. State* (1967), 248 Ind. 142, 223 N.E.2d 347.

Here, the trial court properly found that the contemptuous conduct met the test for direct contempt. The citation was not based upon the personal criticism of the judge contained in the leaflets. Rather, the judge found that the circulation of these leaflets at "the very dorrs [sic] of the courthouse" had interrupted and interfered with the operation of the court, and that this conduct was purposefully calculated to embarrass the court and render its judgments ineffective.

Involved here was not a mere utterance of words. Rather, a sustained assault was launched against the court so that it was struggling to preserve its very existence. As the trial court stated in its contempt order:

> [T]his Court is all but shut down and unavailable for the other members of this community to judicially serve them.
>
> . . . [A]n emergency exists and this court *must act to preserve its very existence* as an effective judicial institution. (emphasis added)

The majority relies upon *LaGrange v. State* (1958), 238 Ind. 689, 153 N.E.2d 593, and *State ex rel. Stanton v. Murray, supra,*

for the general proposition that punishment for direct contempt is improper where the contempt is through ordinary publication. *See also Boggs v. State* (1979), Ind.App., 386 N.E.2d 992.

I agree with the general rule stated, but I find it inapplicable.

*LaGrange* and *Stanton* are clearly distinguishable. In *LaGrange,* a radio newsman was cited for direct contempt for his radio broadcast concerning a possible plea bargain in a homicide case then pending. *Stanton* involved a prosecutor's statements appearing in a newspaper criticizing a judge who was then a candidate for reelection, and the prosecutor's later failure to answer questions in court regarding that interview.

The statements in these cases were for general distribution in the mass media. Here, however, the leaflets were specially prepared and targeted for distribution to those in the immediate vicinity of the courthouse. And the defendant (Skolnick) in this case was seeking to undermine the very validity of the proceedings *at the precise time they were being conducted* by falsely accusing the sitting judge of corruption and illegal conduct. Further, the leaflets were distributed *in the immediate vicinity of the courthouse* and found their way into the courtroom where the hearing was being conducted. Though not 'filed' with the court, the judge obtained knowledge of these leaflets while sitting on the bench in his official capacity, not as a member of the general public. Finally, given the time, place, means of distribution, and contents of the leaflets, their presence in the courtroom *in connection with the surrounding circumstances and events* constituted ample evidence of a direct interference with the operation of the court which merited a direct contempt citation.

This was not an isolated incident of a scandalous leaflet being distributed outside the courthouse. The distribution of these leaflets was preceded by an incessant, ruthless, scurrilous attack upon the trial court judge and his authority to act. The trial

court's order sets forth in some detail part of this vicious barrage which violated the sanctity of the courtroom and vilified the person of the trial judge. These attacks included filing of false affidavits: scandalous, despicable and continuing defamation of the judge via a telephone "hotline"; publication of the judge's home telephone number along with encouraging phone calls to the judge which resulted in harassing and threatening telephone calls to him and his family; physical assault upon the judge; and attempts to institute criminal actions against him. The result of this calculated attack was that the trial judge required armed protection and that the court was, in the words of the trial court, "all but shut down and unavailable to the other members of this community to judicially serve them."

By directing this stream of venomous material into the courtroom, Skolnick was directly defiling the courtroom as certainly as if he had flung refuse through an open courtroom window. So intense was this attack that the trial court was facing paralysis.

In this context, these leaflets could not be viewed as "ordinary publications." They were a present attempt to coerce, intimidate, and threaten the operation of the trial court in order to influence the court's ability to act on the matter then before it—an evil design that almost succeeded.

In my opinion there was direct interference with the court's proceedings while in session and a direct contempt citation was entirely proper, and indeed most deservedly warranted.

I dissent.