FLORENCE MURPHY, AS ADMINISTRATRIX *v.* INDIANA HARBOR BELT RAILROAD COMPANY.

[No. 1271A250. Filed November 16, 1972.]

*Saul I. Ruman,* of Hammond, for appellant.

*Harold Abrahamson, Crumpacker, Abrahamson & Reed,* of Hammond, for appellee.

SHARP, J.—This case was previously considered on a preliminary matter. See *Murphy* v. *Indiana Harbor Belt Railroad Co.* (1972), 152 Ind. App. 455, 284 N.E.2d 84. We now consider it on its merits.

On June 15, 1965 the Plaintiff-Appellant's decedent was killed in a collision between an automobile in which he was riding and one of Appellee's trains at a crossing located in Hammond, Indiana. The Appellant's complaint was in two legal paragraphs, one based on negligence in operating the train and the second based on wilful and wanton misconduct in installing and maintaining automatic controls at said crossing which permitted an automobile to enter said crossing before the signals became operative and before the gates were lowered and before the highway could be cleared of traffic. The Appellee's answer was in admission and denial and also set forth five affirmative defenses, including the defense of contributory negligence.

The case was tried before a jury which returned a verdict against the Appellant on both paragraphs of complaint. This appeal has followed the overruling of Appellant's motion to correct errors.

The Appellant has preserved and argued certain errors of law which she contends are the basis of reversal.

The facts, with all inferences in the light most favorable to the Appellee, disclose that the decedent and two other men attended a union meeting in East Chicago on the evening of June 15, 1965, after which the decedent requested a ride home with one J. C. Talley. The decedent did not have an operator's license since his had been revoked prior to the accident. The decedent was paying J. C. Talley $2.00 per week to drive him to and from work. At about 11:00 P.M. the decedent and two other men drove from the union meeting place, where a strike vote had been taken, to a tavern in East Chicago, stayed about an hour and consumed two beers each. They then went to another tavern at the suggestion of the decedent. The three left the tavern to go home with J. C. Talley driving, the decedent in the middle of the front seat, and one Billy Howell in the right front seat. They proceeded to Columbia Avenue in Hammond, Indiana, upon which they traveled southbound until the accident occurred. It was necessary to take this route to accommodate the decedent by taking him home. It was a clear night and the pavement was dry and there was very little traffic. Columbia Avenue consisted of two lanes northbound and two lanes southbound, the two inner lanes being asphalt and the two outer lanes concrete. Six sets of railroad tracks intersected Columbia Avenue at the site of the collision. Approximately one block north of the railroad tracks in question, Columbia Avenue is intersected by an east and west street known as 150th Street which is controlled by automatic traffic signals. Between 150th Street and the crossings there are no controls for traffic other than a 30 mile an hour speed limit sign. On the right-hand side of Columbia Avenue facing southbound traffic there was a sign reading: "Danger, Railroad Crossing 400 feet. Stop, Look, Listen."

The railroad crossing in question consisted of, from north to south, automatic signals and gate; two sets of tracks

owned by the Elgin, Joliet & Eastern Railroad, separated by approximately 18 feet; pavement of approximately 43 feet; four sets of tracks owned by the defendant separated by approximately 8 feet each, with a spur line entering from the west and connecting to the southernmost track at about the curbline; and, an automatic signal and gate. The circuit breaker for activating the automatic signals and gates was located on the spur line approximately 65 feet from the curbline. Located at the crossing were city installed mercury vapor lights. There was no signal bell at the crossing. The circuit breaker immediately activated the signal flashers which remained on three seconds before the gates began to lower. The gates lowered in eleven seconds. The defendant owned the train involved in the collision and it was being operated over a track also owned by the defendant. The train consisted of a diesel switch engine and 11 loaded cars. Instructions for operating the train consisted of a timetable indicating a crossing speed limit of 20 miles per hour, a headlight display and a bell ringing.

J. C. Talley who operated the car in which the decedent was a passenger testified he had stopped for a stoplight at 150th Street and then proceeded southbound on the inner lane at 30 miles per hour. He was familiar with the crossing since he was a resident in the general area.

The fireman on the train testified that the train had proceeded to the circuit breaker which activated the automatic signals and stopped for fifty or sixty seconds and then proceeded at two or three miles per hour and was on the crossing before the impact occurred. The fireman testified that he had observed an automobile between 150th Street and the gates after the train had started to move from a point near the west curbline of Columbia Avenue. The gates were horizontal before the car reached the crossing. He next observed the car inside the gates swerve to the right and accelerate. He yelled to the engineer to stop and reached for the emergency brake belt. The engineer immediately applied the brakes.

J. C. Talley testified he heard someone yell and a collision occurred with the train coming to a stop approximately five to eight feet from the east curbline of Columbia Avenue with the automobile facing southwest in the same general vicinity. The train sustained damage to the front steps and scratch marks on the side of the train beginning three to five feet from the front. The parties stipulated that the plaintiff's decedent died as a result of the collision.

# I

The Appellant's first assertion of error is based on the following part of the record which occurred during the direct examination of Paul Chartos, a Hammond Police Officer, called as a witness on behalf of the Appellant:

"Q. Now, I will ask you again, have you had opportunities or occasions prior to the night of your investigation to observe engines and gates at a time when an engine was entering that?

A. I have.

MR. ABRAHAMSON: To which we're going to object. I wonder if we might argue out of the presence of the jury.

THE COURT: At this time, we just will have a yes or no answer.

Q. Would you tell us what you have observed with regards to the proximity and time to the engine or train entering the street and the gates coming down to block the street on prior occasions?

MR. ABRAHAMSON: To which we are going to object, and we would like to be heard on the subject out of the presence of the jury.

THE COURT: Take the jury out. This will be off the record.

[Argument heard off the record—some of the argument appears in the record, but not in its entirety.]

THE COURT: The record will show that the question is withdrawn, the objection withdrawn and the stipulation, two stipulations are made and we'll call the jury, I'll read them that stipulation. I'll tell them the parties,

regarding the last question, the parties have made the following stipulation. JURY BROUGHT INTO COURT. Ladies and Gentlemen, regarding the last question, the parties have made a stipulation which is as follows: The parties stipulate that for an eastbound train on track number 6, as the evidence indicates the train in question here was located, there is a circuit breaker 64 feet, 6 inches west of the west edge of the pavement Columbia Avenue, as shown by the exhibit in evidence; that when a locomotive reaches that circuit breaker, it starts a process that activitates [sic] the flashers and gates which are located both to the north and to the south of the crossing in question; that the flashers begin to flash and that at or about the same time, the gate begins its descent; that the length of time required for the gate to come down to the full horizontal position is 11 to 14 seconds and that if a locomotive proceeded from the circuit breaker out on to the crossing without the 11 to 14 seconds having elapsed, that the locomotive would be on the crossing and the gates not yet at their full horizontal or down position. The parties further stipulate that on certain occasions prior to June 15th, 1965, and on certain occasions, subsequent to June 15th, 1965, that a locomotive or cars operated by the defendant, Indiana Harbor Belt Railroad, have been on the crossing prior to the time the gates reached their full horizontal or down position.

Q. Following the investigation of this accident, did you have occasion to return to that scene?

A. Yes, I did.

\* \* \*

Q. Let me ask you, at that time did you observe trains on any of the tracks when you went there, without going into detail, this can be answered yes or no.

A. Yes, I did.

Q. Was it I.H.B. trains?

A. Yes, sir, it was.

Q. And on which track?

A. On the track number 6.

Q. Coming from which direction?

A. Going from west to east.

Q. And did you stay there and observe what took place at that point?

A. I did.

Q. Now don't answer the next question, please, because they want to object. Would you tell us what happened at that time?

MR. ABRAHAMSON: I think we're going to object, if the Court please, on the ground what took place with some train subsequent is not material to any of the issues in this case. Further, I thought we reached an agreement. I thought we had a stipulation entered into during the noon hour so that we didn't have to be raising these objections during these proceedings.

THE COURT: Make your offer to prove.

MR. RUMAN: We offer to prove that the witness would testify in response to that question that he saw the engine approach from the I.H.B. at a slow rate of maybe five miles an hour coming from the Farm Bureau on the same track that the train had been on that was involved in the accident and that the train approached the street and entered the street without stopping and that the gates did not come down to down position until the train was then half way or slightly more than half way across Columbia, past the middle.

THE COURT: Show the offer refused. I'm going to sustain at this point."

The trial court did not commit any reversible error in excluding the admission of evidence of the train movements before and after the collision involved in this case. The crossing in question is located in a switching area, on both sides of the crossing, involving countless slow moving trains during a 24 hour period. To avoid constant blocking of the crossing, the circuitry was designed, pursuant to the request and agreement of the City of Hammond, to avoid the operation of the flashers and gates until a train was about to enter the crossing. The railroad rules required, and a railroad posted sign in the yard indicated, that all trains must stop before entering the crossing. For trains traveling in the direction as the one here in question, this sign and the circuit were approximately 65 feet from the road. The undisputed evidence is that when a train reaches the circuit, it activates the

flashers. Three seconds later, the gates begin to come down. For the gates to reach the full down position, requires 11 seconds which, added to the 3 seconds before they start their descent, requires 14 seconds from the time they are activated. If the train did not stop where required and was traveling at a speed of 15 miles per hour (22 feet per second) the train would be on the crossing before the gates start down. This fact was undisputed and was the basis for the stipulation. The crossing involved six sets of tracks and was used by at least one railroad (the E.J. & E.) other than defendant. There was an interval of six years between the date of the accident and the time of trial.

Even in light of the stipulation such ruling is not error. When a trial court permits such evidence of other occurrences over proper objection it may tread on soft ground. That is certainly the wisdom embodied in a number of cases in Indiana, including *Farm Bureau Mut. Ins. Co. of Ind.* v. *Seal* (1962), 134 Ind. App. 269, 179 N.E.2d 760, and *Evansville & T.H. R. Co.* v. *Keith* (1893), 8 Ind. App. 57, 35 N.E. 296.

## II

The Appellant offered into evidence two exhibits which were movie pictures of trains being operated at this particular crossing. The movie picture films were taken about two months following the collision in this case. The only train which the witness could identify in those films was one belonging to a railroad other than the Appellee. The general circumstances attempted to be portrayed in these movie film strips were already the subject of stipulation between the parties. Additionally the flasher and gate in question here was not shown in the movie film strips. The trial judge obviously took the cautious route and excluded these film strips from the jury and in doing so he did not commit reversible error.

The admission of similar acts, occurrences or transactions

as proof that a particular act was done or that a certain occurrence happened generally rests in the discretion of the trial court. *Evansville & T.H. R. Co.* v. *Keith, supra* and *Farm Bureau Mut. Ins. Co.* v. *Seal, supra.*

## III

There had been a motion sustained to separate non-party witnesses at the outset of the trial. The Appellee called one Ronald Staicar, a fireman on this particular train as a witness. The fireman testified as to the movement and operation of this train. On cross-examination by the Appellant's counsel he was questioned about the contents of a statement he had made to the police at the scene of the collision. The key question and answer here are:

"Q. Then at that time and place, isn't it true that in talking to Officer Chartos and giving him a statement, you, at no time mentioned that the train stopped at that crossing, but rather said that that train proceeded straight out on to Columbia after crossing the breaker, isn't that what you told Officer Chartos?
A. No."

Thereafter, on rebuttal the Appellant attempted to call Officer Chartos. Objection was made that Officer Chartos had remained in the court room during part of the testimony of the witness Staicar. The trial court did not permit Officer Chartos to testify on rebuttal and gave the following reasons:

"THE COURT: I'm going to sustain the objection on the ground he knew what the rules were and if he heard probably any part of Staicar's testimony, then I think it gives him an advantage that no other witness had and therefore it is not like excluding direct evidence and for that reason, I think it gives him an unfair advantage."

Again, the trial court acted prudently and without reversible error. This matter was within the sound discretion of the

trial judge and therefore no abuse was shown. This learning is well said by our Supreme Court in *Romary* v. *State* (1945), 223 Ind. 667, 64 N.E.2d 22. See also, *Kelly* v. *State* (1948), 226 Ind. 148, 78 N.E.2d 547, and *Butler* v. *State* (1952), 229 Ind. 241, 97 N.E.2d 492.

## IV

In the Appellee's fifth affirmative defense it was alleged that the Appellant made a settlement with the driver of the car which constituted payment in whole or in part of the Appellant's claim in the sum of $1000.00 This issue came up in the trial in the following manner:

"MR. ABRAHAMSON: At this time, if the Court please, the defendant will offer into evidence what has been marked for identification purposes as Defendant's Exhibit K, being the Petition of the Administratrix in the Chizk Estate concerning the compromise of a claim against Talley and the order approving it.

MR. RUMAN: May it please the Court. Mr. Abrahamson, would you approach the bench. (Conversation at the bench, off the record.)

THE COURT: (out of the hearing of the jury) Let the record show that as to Defendant's Exhibit K, the Court rules that the plaintiff may either stipulate that the Estate Plaintiff received the sum of $1,000 from J. C. Talley, which authority to compromise was approved by the court, and as a result thereof, the plaintiff executed a Covenant Not to Sue, or Defendant's Exhibit K will be admitted.

MR. RUMAN: The plaintiff will object to the Court's order because it violates the evidentiary laws in this State and is prejudicial because first, the evidence of settlement is not relevant to this action. The only relevant evidence could be if it was a complete release of all tort feasors was raised by the release of one, and that in this case, the Court's approval of a Covenant Not to Sue in partial settlement. Any evidence of settlement or release should not be given to the jury. The plaintiff has requested that the Court either deduct $1,000.00 which plaintiff stipulates was received in settlement from a third party without informing the

jury of that fact which does not bear upon the issues in this case, or, that the jury simply be told plaintiff stipulates that $1,000.00 has been received by the estate in settlement with a third party other than this defendant, and that in rendering a verdict, the jury, if they awarded damages, should deduct that $1,000.00 from the amount of damages awarded. That has been plaintiff's offer and request in response to the Court's order for the plaintiff to elect between two alternatives suggested. The plaintiff submits that it objects to the Court's order for the additional reason that the covenant not to sue is not included, which was part of the records that, which was part of the procedure and that that does not give complete evidence.

THE COURT: I'll admit K. Show K admitted. Objection overruled."

Whether or not the payment so made constituted full satisfaction of the claim is normally a question of fact. In *Bedwell* v. *DeBolt* (1943), 221 Ind. 600, 50 N.E.2d 875, 878, our Supreme Court stated:

"It is well settled that all joint tort-feasors liable for an injury are discharged by the unqualified release of one. The amount of the consideration paid for such a release is immaterial so long as it is sufficient to support a contract and the transaction is not tainted by fraud or mistake. Likewise, full satisfaction of such a claim for damages by one of the tort-feasors operates to discharge although no release is executed.

On the other hand, it is equally well settled that a covenant not to sue one tort-feasor does not bar an action against the others, but only operates as a satisfaction of the damages, pro tanto, as to the benefits received. But if the consideration paid for a covenant not to sue is full compensation for their injury, the liability is discharged as to all, regardless of the character of the instrument, and may be added that under an answer of full satisfaction by a joint tort-feasor a defendant is entitled to a pro tanto credit for anything less than full payment which the plaintiff has received from that source. Whether the payment was in full or partial is for the jury to determine from the evidence. This is consistent with the rule that an answer of payment will authorize proof of a credit."

For a more recent application of this rule see *Lows* v. *Warfield* (1971), 149 Ind. App. 569, 274 N.E.2d 553.

### V

The witness, J. C. Talley, testified by way of deposition taken in Hammond, Indiana, the week before trial. During the trial the entire deposition was offered by the Appellant. On cross-examination the following occurred:

"(Mr. Abrahamson:) Q. . . . Do you have any recollection of having been interviewed or questioned by any police officer at some future date at the police station?

A. At the police station?

Q. Yes.

A. Yes, one asked me questions but I didn't . . . didn't tell him anything at the police station.

Q. You did not tell him anything?

A. No.

Q. Did you refuse to answer his questions?"

\* \* \*

"MR. RUMAN: Objection.

THE COURT: Overruled."

\* \* \*

"A. Well, I didn't exactly refuse. I guess I did refuse and not exactly, too. I spoke to my lawyer over the phone. He rather I not say anything.

Q. In other words . . .

A. You know, a few minutes, I asked if it was all right, but I didn't answer any questions except tell him my name and address.

Q. In other words, the police officer advised you of your constitutional right and indicated to you if you refused to make any statements . . .

A. Yes.

Q. . . . under the constitution that you were not obliged to make a statement.

A. That's right.

Q. And you elected not to make any statement; is that right?"

\* \* \*

"MR. RUMAN: Objection; repetitious.

THE COURT: Overruled."

\* \* \*

"A. Yes."

\* \* \*

"Q. Now, after that, were you subsequently asked some questions concerning this collision at a corner's [sic] inquest?

A. Yes.

Q. And were you advised at that coroner's inquest that under the constitution, the Fifth Amendment, that you had the right to remain silent . . ..

A. Yes.

Q. . . . and not to make any statements, but if you made one, it might subsequently be used against you?

A. Right.

Q. You were advised of that. And did you at that time invoke your right not to make any statement?"

\* \* \*

"MR. RUMAN: Objection, hearsay.

THE COURT: Overruled."

\* \* \*

"A. Yes, I did."

On redirect examination Appellant's counsel pursued the same subject matter as follows:

"Q. Mr. Talley, first you were asked some questions about whether you gave statements and I believe you said that on a lawyer's advice, on your lawyer's advice, that you did not give statements at several occasions when you were asked. First of all, was the lawyer you were referring to me or did you have another.

A. No.

Q. Did you have your own lawyer?

A. At the time I was at the police station, Harry . . .

Q. I don't think it is necessary to give the name. Did you have a lawyer of your own?

A. Yes.

Q. Was that me or someone else?

A. Not you."

\* \* \*

"MR. RUMAN: I withdraw my first question.

MR. ABRAHAMSON: We are not going to permit the withdrawal of a question in an evidentiary deposition . . .

MR. RUMAN: May we approach the bench? I would at this time object to Mr. Abrahamson's remarks in front of the jury, he won't permit withdrawal of questions by plaintiff's counsel as inferring to the jury, the plaintiff has no right to the deposition . . .

THE COURT: Off the record. (conversation at the bench off the record) The Court rules that inasmuch as all the direct examination and all the cross examination has been read, that the re-direct must all be read or none of it read.

MR. RUMAN: And that the plaintiff has requested to omit certain questions at this point pertaining specifically to question 21 on page 53 and other questions dealing with the lawyer and omit that subject completely on re-direct and go only to the questions dealing with the occurrence and the Court has ordered the reading of the entire re-direct.

THE COURT: Let the record show that while out of the presence of the jury, counsel gave the Court all objections and the Court made rulings on most objections; that after the ruling upon the objections in the latter part of this deposition, counsel now wishes to withdraw evidence. The Court rules that counsel cannot request the Court to rule on that after its own rulings."

Appellant here attempts to assert for the first time that the trial court erred in permitting the testimony regarding Talley's invocation of his privilege against self-incrimination. The Appellant failed to make the objection on this basis in the trial court. In *Lakes* v. *Moore* (1965), 137 Ind. App. 681, 683, 206 N.E.2d 152, the Appellate Court said:

"The rule long established in this State is that an objection to a question must be full and comprehensive in pointing out the particular reason for the objection. Beeler v. State (1952), 250 Ind. 444, 104 N.E.2d 744; Allman, et al. v. Masbury, et al. (1945), 224 Ind. 177, 65 N.E.2d 106. Further, the argument portion of the brief must approach the objection on the same ground

as that made at the time of trial. We note that the objections made at the time of trial were not sufficiently comprehensive to present any question to the trial court, and that the appellant has attempted to enlarge upon these objections in his appeal which is not permitted. By reason of the foregoing, no question is before us concerning either the objections made during the trial or the trial court's ruling on such objections."

The Appellant made a general objection at the trial. Appellant now appeals on objections separate from those raised at trial. Appellant has waived any objections concerning the testimony in question and no question is presented on review.

We must emphasize that no assertion of the privilege against self-incrimination was asserted by the *witness in this trial* so we are not here confronted with the use of that privilege in civil litigation. Neither are we here required to determine the application in civil litigation of the principles announced in *Grunewald* v. *U.S.* (1957), 353 U.S. 391, 77 S. Ct. 963, 1 L. Ed. 2d 931. See also, *United Electrical Radio & Machine Workers et al.* v. *General Electric Company* (DC DC 1954), 127 F. Supp. 934, and *Independent Production Corp.* v. *Loew's Inc.* (SD NY 1958), 22 FRD 226.

As a further matter it is apparent that the trial judge did not abuse his discretion in regard to the scope of cross-examination. *Craig* v. *Citizens Trust Company* (1940), 217 Ind. 434, 26 N.E.2d 1006. See also, *Vanosdol* v. *Henerson* (1939), 216 Ind. 240, 22 N.E.2d 812.

## VI

The next and last contention of the Appellant relates to the asserted error of the trial court in giving of instruction number 15 relating to wilful and wanton misconduct of the Appellant as a defense, instruction number 16 relating to a question of contributory negligence and instructions numbers 33 and 34 relating to the issue of the existence of any joint enterprise between the Appellant's decedent and the driver, J. C. Talley.

Trial Rule 51 (c) provides, in pertinent part, as follows:

"(C) Objections and request instructions before submission. At the close of the evidence and before argument each party may file written requests that the court instruct the jury on the law as set forth in the requests. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. No party may claim as error the giving of an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury. The court shall note all instructions given, refused or tendered, and all written objections submitted thereto, shall be filed in open court and become a part of the record. Objections made orally shall be taken by the reporter and thereby shall become a part of the record."

As in *Barton* v. *Mirich* (1971), 149 Ind. App. 395, 273 N.E.2d 115, the record in this case fails to disclose whether any written or oral objections to instructions were submitted to the trial court and made a part of the record in this case. As indicated by the reasoning and result in *Barton* v. *Mirich* the purpose of Rule 51 (C) is to advise the trial court of the basis for objections to any instructions given as well as to advise the adverse party so as to afford the opportunity to correct any error at the trial court level. However, the record here is completely devoid of any specific objections as to any of the instructions referred to. See also, *Snider* v. *Lewis* (1972), 276 N.E.2d 160; *Scott* v. *Kruger* (1972), 151 Ind. App. 479, 280 N.E.2d 336; and *Hart* v. *State* (1972), 285 N.E.2d 676.

This case was tried by able and talented trial counsel before an experienced and competent trial judge. It was tried with vigor and imagination on both sides and the trial judge permitted the introduction of a wide range of evidence which permitted a range of inferences, including the inferences drawn by the jury in arriving at its verdict.

We believe that justice was done in this case and that the decision of the trial court should be and hereby is affirmed.

Judgment affirmed.

Hoffman, C.J. and Staton, J., concur.

NOTE.—Reported at 289 N.E.2d 167.