Stephen BOTTOMS, United Mine Workers of America, and David Norrick, Individually, and as a Member of the United Mine Workers et al., Defendants-Appellants,

v.

B & M COAL CORPORATION,
Plaintiff-Appellee.

No. 1–379A63.

Court of Appeals of Indiana,
Fourth District.

June 4, 1980.
Rehearing Denied July 8, 1980.

David O. Kelley, Boonville, for defendants-appellants.

Halbert W. Kunz, Kunz & Kunz, Indianapolis, for plaintiff-appellee.

CHIPMAN, Judge.

This consolidated appeal [1] arises from violations of a restraining order issued during a period of intense, and occasionally violent, labor strife in Southern Indiana. In the first case the Spencer Circuit Court found appellants United Mine Workers and 191 individually named union members in civil contempt for their actions at the B & M Coal dock on January 7, 1978. The second case involves only one person, Stephen Bottoms, who was held in contempt for damaging two trucks which were leased to B & M Coal. Both cases are affirmed in part and reversed in part.

### FACTS

On December 6, 1977, the national labor contracts between the United Mine Workers of America and the coal mine operators expired. That same day the UMW called a nationwide strike and union members walked off their jobs. As a result, virtually all union coal mining operations in Indiana stopped. However, B & M Coal, a non-union coal loading facility on the Ohio River, remained open and operating.[2]

During the first few days of the strike a number of B & M's drivers were harassed by union members. In response, B & M sought a temporary restraining order and

---

1. The two cases were consolidated on August 29, 1979 when this Court granted Appellee's Petition to Consolidate.

2. B & M's operations are limited to hauling coal from area mines and transferring it onto barges from transportation up and down the Ohio River.

injunction in the Spencer Circuit Court. On the same day the court issued the following Temporary Restraining Order (TRO) against the United Mine Workers of America and "John Doe, Numbers 1 through 100."

"IT IS ORDERED that the said defendants, their agents, servants, members, employees and attorneys and all persons in active concert and participation with them be and they hereby are restrained and enjoined, pending the determination of this action, from harassing, from preventing or blocking plaintiff, its employees, agents and contractors from operating to, from and onto plaintiff's coal loading facility approximately one-quarter mile North of Rockport, Indiana, and more fully described in the Affidavit In Support of Motion for Temporary Restraining Order, and from preventing, harassing or blocking the travel of vehicles, including those driven by plaintiff's contractors, hauling coal from various coal mines to plaintiff's coal loading facility; provided that plaintiff first gives security in the sum of Five Hundred Dollars ($500.00), for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined, such Bond to be approved by the Clerk of the Court, no later than December 8, 1977. The Court fixes December 15, 1977, at 9:30 A. M. for hearing on permanent Injunction."

The order was amended on December 12, 1977, to limit the permissible number of pickets to three per site.

"IT IS ORDERED that the said defendants, their agents, servants, members, employees and attorneys and all persons in active concert and participation with them be and they hereby are restrained and enjoined, pending the determination of this action, from picketing at any site within the scope of the restraining order issued by this Court on December 8, 1977, in numbers greater than three (3) and further that such pickets, if any, shall be conducted peaceably and shall be subject to the Temporary Restraining Order issued by this Court of December 8, 1977. The Court fixes December 15, 1977, at 9:30 o'clock A. M., for hearing on Permanent Injunction."

On December 14, 1977, the effectiveness of the order was extended until a hearing on a permanent injunction could be held.

Copies of the TRO and the amended TRO were served on the headquarters of District 11 of the United Mine Workers and David Kelley, attorney for District 11. The orders were read to striking miners at various coal mines throughout the area by the local sheriff and his deputies, and on at least one occasion copies of the order were passed out to strikers. A great deal of local and national publicity surrounded the strike, including the issuance of the restraining orders.

The facts upon which the contempt citation against the UMW and 191 individuals is based occurred on January 7, 1978. Paul Teegarden, executive officer and manager of B & M Coal, received information from an informant that the B & M facility would be "raided." In anticipation thereof he closed down operations and sent his employees home early. Teegarden and an attorney, Frank Hahn, remained on the premises in a trailer which served as an office.

At approximately 5:00 p. m. two "convoys" of cars and pick-up trucks converged at B & M's front gate from different directions. Frank Hahn estimated each column to be one and one-half mile long; approximately 200 vehicles and 400–500 men were involved.

It was dark and a fog was rolling in off the river when the convoys arrived. As a result, witnesses could not see well. However, as soon as the vehicles stopped they heard doors slamming, the sound of feet in gravel and shouts of "come on," and "let's go." Teegarden and Hahn then saw a group of men approximately eight abreast and five deep enter an area illuminated by a flood light. Many of the men were carrying clubs. The group quickly dispersed into smaller groups of three to four men and the sounds of breaking glass, explosions, gun shots and the light of fires soon followed.

Teegarden and Hahn remained in the trailer. Both testified the trailer's windows were broken and they could hear the exterior being struck with clubs. A flare was thrown into the trailer and Teegarden picked it up and threw it back out a broken window. Voices from outside the trailer were heard to say, "Teegarden is in there," and "kill the son-of-a-bitch." At about this time police sirens sounded and the men began returning to the vehicles parked on the road. The entire incident lasted approximately seven minutes.

After putting out a fire on the steps of the trailer, Teegarden and Hahn stepped out to survey the damage. Nearly every vehicle on the B & M premises was on fire and many had broken windows, flat tires and extensive body damage. Teegarden's car was on fire and Hahn's was upside down.

Throughout the raid Sheriff Rininger and a deputy were parked in an unmarked car 150 yards from the B & M gate. As the two columns of vehicles arrived, Rininger noticed most of the license plates had been covered with mud. As men began to leave their vehicles Sheriff Rininger radioed the State Police and requested assistance.

When the State Police arrived, they blocked off the road at both ends of the convoy. Forty to fifty cars were allowed to pass through the road block before a decision was made to arrest the remaining men. All 191 individual defendants were arrested at that time. They were taken to the courthouse where arrest cards were made out for each individual. All the men were released within a few hours.

On January 30, 1978, B & M Coal filed a Motion for Violation of Temporary Restraining Order. Each defendant was served with a copy of a Citation to Show Cause and Order to Appear. After a bench trial the Spencer Circuit Court held the UMW and 191 individuals in contempt for violations of its orders and ordered them to pay $173,873.09 to B & M coal for damages caused on January 7.

"IT IS, THEREFORE, CONSIDERED, ORDERED AND ADJUDGED by the Court that the defendants, named herein, are in contempt of this Court and that the said defendants, jointly and severally, pay the sum of $173,873.09 to the plaintiff, B & M Coal Corp., within ten (10) days of this date and the sum of $10,-117.72 to plaintiff's attorneys within ten (10) days of this date. It is further ordered upon defendants' failure to pay said amounts in full within ten (10) days of this date, that each and every defendant named herein be committed by the Sheriff of Spencer County to the Spencer County Jail until said sums are paid in full."

The facts which give rise to the holding of Stephen Bottoms in contempt of court for violating the restraining order are as follows. On March 20, 1978, Lee Steele and Rick McDonald were each driving a coal truck on State Road 74 approaching the town of Arthur Junction, Indiana. Their trucks were leased to B & M Coal Company. As they passed the Arthur Junction fire station they encountered a group of about 50 people. A rock was thrown by a man later identified by Steele as Stephen Bottoms. The rock broke Steele's windshield and he stopped his truck on the side of the road. Bottoms then came up to the cab of Steele's truck, shouted at him and struck him on the arm with a set of "numbchucks."

Rick McDonald had a similar experience. He testified he stopped his truck behind Steele's; as he did so, a man he later identified as Stephen Bottoms threw a baseball bat at his windshield, breaking it. Bottoms then retrieved the bat and proceeded to strike the driver's side mirror but succeeded only in bending the mirror bracket.

Neither man had seen Stephen Bottoms before but both men picked Bottoms' picture from photographs shown them by the local Sheriff's Department. They also identified Bottoms in court.

On March 29, 1978, B & M Coal filed a Motion to Cite Stephen E. Bottoms for Violation of Temporary Restraining Order and

Bottoms was subsequently served with a show cause citation and ordered to appear. Following trial, Bottoms was found in contempt of court and ordered to pay $283.52 to B & M Coal for damage to the trucks.

"IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED by the Court that the defendant, Stephen E. Bottoms is guilty of Contempt of this Court and that the said Stephen E. Bottoms pay the sum of Two Hundred Eighty-Three Dollars and Fifty-Two Cents ($283.52) to the plaintiff, B & M Coal Corporation, within 10 days of this date, and an additional sum of Five Hundred and Fifty Dollars ($550.00) to plaintiff's attorneys herein for preparation and trial of this suit, within 10 days of this date. It is further ordered upon defendant the failure to pay said amounts to plaintiff and plaintiff's attorneys within 10 days of this date, that the defendant, Stephen E. Bottoms, be committed by the Sheriff of Spencer County, Indiana, to the Spencer County Jail until such sums are paid in full."

## ISSUES

The issues necessary to our resolution of this case are listed below. Issues I and II are raised by Bottoms and the UMW and 191 individuals. Issue IX concerns Bottoms only. The remaining issues apply solely to the UMW and 191 individuals.

I. Whether the form of the court's order was improper in that it ordered imprisonment if the damage awards were not paid in ten days?

II. Was service of the temporary restraining order and amended TRO sufficient?

III. Was there sufficient evidence to prove appellants acted in concert and that they should be held jointly liable?

IV. Was there sufficient evidence to prove appellants violated the temporary restraining orders?

V. Were the damages excessive?

VI. Did the court erroneously admit evidence of other raids?

VII. Did the court erroneously admit arrest cards?

VIII. Did the court erroneously prohibit the disclosure of an informant's identity?

IX. Was the photographic display unnecessarily suggestive and was there sufficient evidence to identify Stephen Bottoms?

## I. IMPRISONMENT ORDERS

■ For their first argument appellants contend the "form of the judgment . . is improper." Specifically they argue that part of the judgments which ordered incarceration in the event the damage awards were not paid within ten (10) days is forbidden by Indiana law as a "predetermination of a penalty for noncompliance." B & M Coal claims this part of the order was not punitive, but merely coercive. Appellants are correct; we order the judgment amended to delete the language concerning potential imprisonment.

In *Thomas v. Woollen*, (1971) 255 Ind. 612, 266 N.E.2d 20, a trial court held the defendant in contempt for violating an injunction which concerned the use of a driveway. In finding the defendant's acts to be contemptuous the court also ordered further unspecified "affirmative action." The order provided for additional fines and imprisonment if the "affirmative action" aspect of the order was not complied with. The Supreme Court reversed the judgment "insofar as it prescribed the damages and incarceration in anticipation of future contempt." *Id.* 266 N.E.2d at 23. Reasoning that judicial orders are generally followed, the Court held the proper remedy for a failure to obey an order is to bring the offender before the court a second time and then determine the appropriate penalty, if any. This procedure was later endorsed by the Court of Appeals in *Caito v. Indianapolis Produce Terminal*, (1974) 162 Ind.App. 590, 320 N.E.2d 821, where it was stated, "Automatic incarceration is forbidden by *Thomas*." *Id.* 320 N.E.2d at 827.

■ Although there are older cases to the contrary,[3] we believe *Thomas* and *Caito* control this issue. Fundamental notions of fairness demand an opportunity for a non-complying party to present reasons for failure to follow the mandates of a court. The person may have been prevented from complying for a myriad of reasons we cannot even begin to imagine. In such a case a court could properly conclude no additional sanctions or coercions would be called for. In the other extreme, the only excuse for noncompliance might be pure stubborn rebellion, a situation in which relatively harsh measures, including incarceration, would be justified. In either case the noncomplying party must first be given the opportunity to explain the noncompliance. A court cannot "anticipate the breach, assess the penalty and provide for the execution." *Thomas v. Woollen, supra,* 255 Ind. at 617, 266 N.E.2d at 23.

The judgment is reversed to the extent it orders automatic incarceration.

## II. SERVICE OF TEMPORARY RESTRAINING ORDER

Appellants argue they cannot be held in contempt because they were not properly served with notice of the restraining orders. B & M Coal does not dispute the lack of formal service on most of the appellants[4] but contends the remaining appellants had actual knowledge of the orders, thus rendering formal service unnecessary. We agree with B & M.

■ It is generally true that notice of an injunction or restraining order must be served on the person or persons enjoined or restrained by the order. Ind.Code 34–1–10–7. There exists, however, an exception to this general rule. Where it can be shown

that a person had actual knowledge of the restraining order or injunction he may be held liable for violating the provisions of the order. *Shaughnessey et al. v. Jordan et al.,* (1916) 184 Ind. 499, 111 N.E. 622; Ind. Rules of Procedure, Trial Rule 65(D).[5] There is no presumption that affected persons have actual knowledge of an order; knowledge must be established from the facts presented to the trial court. *See Cross Co. v. United Automobile, Aircraft & Agricultural Implement Workers of America, Local 155,* (1966) 377 Mich. 202, 139 N.W.2d 694. Actual knowledge may be proven by circumstantial evidence, *General Teamsters Local Union No. 528 v. Allied Foods,* (1971) 228 Ga. 479, 186 S.E.2d 527, or simply inferred from the facts, *In re Jersey City Education Association,* (1971) 115 N.J. Super. 42, 278 A.2d 206.

■ The facts in the record amply support a finding that all appellants had actual knowledge of the restraining order. The order was formally served on David Kelley, attorney for the UMW, and the United Mine Workers District 11 headquarters. It was read numerous times during the strike by law enforcement officials to groups of striking miners which ranged in size from three to one hundred fifty (150) men. Additionally, the strike and restraining orders received nation wide publicity in the print and broadcast media. We also note the testimony from miners who discussed the organization of "convoys." They stated these vehicular caravans were organized with relatively little formal leadership and that simple word of mouth communication resulted in convoys of up to two hundred (200) cars and trucks. Given this evidence of a pervasive, and apparently highly effec-

---

3. *See, e. g., Duemling v. Fort Wayne Community Concerts, Inc.,* (1963) 243 Ind. 521, 188 N.E.2d 274; *Trotcky v. Van Sickle,* (1949) 227 Ind. 441, 85 N.E.2d 638; *Bangs v. Northern Indiana Power Co.,* (1937) 211 Ind. 628, 6 N.E.2d 563.

4. Formal service was had on appellant United Mine Workers at its District 11 headquarters. The order was read to Addison Brock, a UMW official, and Herman Wolfe, one of the 191

individual defendants. David Kelley, attorney for District 11, was also served.

5. TR 65(D) provides a restraining order or injunction is binding only upon "the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise."

tive, grapevine and the extensive media coverage in the actual reading of the orders, appellants' claims of ignorance of the orders are incredible and unpersuasive. There was more than sufficient evidence to support a finding of proper service on all appellants.

## III. JOINT ACTION—CONSPIRACY

Appellants next challenge the court's finding that they acted jointly and in concert during the January 7 raid on B & M Coal. They argue there is no evidence to show the United Mine Workers, as a separate entity, had anything to do with the raid and that the evidence does not support a finding that all 191 individuals violated the restraining order. We agree with appellants' assertion with regard to the UMW, but find sufficient evidence to sustain a finding of joint action by the 191 individual appellants.

 The judgment of the trial court found the UMW and 191 individuals jointly and severally liable for the damages caused by the raid on the B & M Coal Dock. This judgment was proper if the evidence demonstrated appellants acted jointly or pursuant to a conspiracy.[6] When, as here, a conspiracy is alleged in a civil contempt[7] action each participant in the conspiracy may be held responsible as a joint tortfeasor for damages caused by the wrongful or contemptuous acts regardless of the degree of active participation. *See Black v. Sullivan,* (1975) 48 Cal.App.3d 557, 122 Cal. Rptr. 119; *Fort Wayne Cleaners and Dyers Association v. Price,* (1956) 127 Ind.App. 13, 137 N.E.2d 738; *Baker et al. v. State Bank of Akron,* (1942) 112 Ind.App. 612, 44 N.E.2d 257; *Still v. Benton,* (1968) 251 Or. 463, 445 P.2d 492. As appellants point up,

the cause of action is not for the conspiracy, *Doniphan v. Lehman,* (7 Cir. 1902) 179 F. 173 (conspiracy to commit contemptuous act does not constitute contempt), but for damages caused as a result of the conspiracy. *Indianapolis Horse Patrol, Inc. v. Ward,* (1966) 247 Ind. 519, 217 N.E.2d 626; *Lake Mortgage Co., Inc. v. Federal National Mortgage Association,* (1974) 159 Ind.App. 605, 308 N.E.2d 739.

 There is insufficient evidence to sustain the court's finding that the UMW, as a distinct and separate entity, was a participant in the raid. The only evidence upon which the court could have based its conclusion was a "threat" by District 11 President Larry Reynolds, who indicated there might be "trouble" if B & M did not cease operations and the holding of a meeting at the Boonville Union Hall shortly before the raid. Applying our standard of review, we think the ambiguousness of Reynolds' statement and lack of evidence regarding the purpose of the Boonville meeting militate against a finding of union involvement in the raid. This is particularly true as no union officers or employees were arrested or, as far as can be determined, even present during the activities at B & M Coal on January 7. A union may be held liable only according to traditional doctrines of agency. *See United Mine Workers of America v. Gibbs,* (1966) 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218; *Mason-Rust v. Laborers' International Union Local 42,* (1970, 8th Cir.) 435 F.2d 939. Ambiguous threats, purposeless meetings and noninvolvement by union officers and employees do not prove active or passive participation in a conspiratorial action. We therefore conclude the union cannot be held jointly

---

**6.** A civil conspiracy is a combination of two or more who by concerted action seek to accomplish an unlawful purpose or to accomplish some lawful purpose by unlawful means. *Holloway v. Thompson,* (1942) 112 Ind.App. 229, 42 N.E.2d 421.

**7.** Civil contempt is essentially an enforcement mechanism used to coerce compliance with an injunction or restraining order for the benefit of

an injured party. *Ice v. State ex rel. Indiana Board of Dental Examiners,* (1979) Ind.App., 397 N.E.2d 1041. For a discussion of other types of contempt actions, see *Duemling v. Fort Wayne Community Concerts, Inc.,* (1963) 243 Ind. 521, 188 N.E.2d 274, *Denny v. State,* (1932) 203 Ind. 682, 182 N.E. 313, *Skolnick v. State,* (1979) Ind.App., 397 N.E.2d 986.

liable for the damage done to the B & M Coal Dock.[8]

Our conclusion with regard to the 191 individual appellants is different, however. There was ample evidence presented to prove the raid to be a joint, organized, almost orchestrated act. The evidence shows two columns of vehicles arrived simultaneously at the B & M Dock just as darkness fell. Nearly all the license plates had been covered with up to an inch of mud. With apparent purpose, men left their cars, entered the premises in a large group and then broke off in two's and three's to destroy certain pieces of equipment or set fires. During the raid Paul Teegarden heard one of the men caution another not to damage the trailer in which Teegarden was hiding by saying, "It's not on the list." Throughout their testimony Teegarden and Hahn recited their impression of the raid as "very organized" and "conducted with military-like precision." We are totally convinced this action was carried out in an organized, conspiratorial fashion thus rendering all active and passive participants jointly and severally liable. The court's finding of joint and several liability for the 191 individual appellants was not error.

## IV. VIOLATION OF TEMPORARY RESTRAINING ORDER

■ Appellants contend the evidence was insufficient to support the finding that they violated the terms of the restraining orders. B & M Coal argues the evidence was more than sufficient. B & M is correct.

The TRO which appellants were found to have violated states they were "restrained and enjoined . . . from harassing, from preventing or blocking plaintiff [B & M Coal], its employees, agents and contractors from operating to, from and onto plaintiff's coal loading facility . . . ." Speciously, appellants argue the evidence concerning the January 7 raid does not constitute a violation of this order. They claim

there is no evidence to show anything other than their presence in the middle of the road during a "traffic jam." Essentially it is argued the "substantial damage" done to the B & M facility at that time should be considered merely coincidental with appellants' presence because of a lack of evidence connecting specific individuals to specific acts of violence. It is also claimed there was no technical violation of the restraining order because B & M Coal had closed at 2:00 p. m. on January 7, thus making it impossible for anyone to harass, block or prevent B & M's operations.

Contrary to these assertions, the evidence and reasonable inferences therefrom clearly show an organized, violent raid on the B & M Dock. Men were seen and heard leaving their vehicles, entering B & M's premises, burning and vandalizing B & M's property and returning to the road. The fact the coal dock was not operating at the time of the raid is of no significance. Teegarden closed the dock early in anticipation of the raid and to prevent injury to his employees. Appellants cannot benefit from this act of preservation and good judgment.

Appellants' arguments ask this Court to believe hundreds of men from points all across the state spontaneously responded to some informal beckoning and joined in two convoys each of which was caught in a traffic jam at precisely the moment someone else was destroying the B & M Coal Dock. For obvious reasons we do not accept this interpretation and hold there was sufficient evidence to find appellants in contempt for violating the court's restraining order.

## V. DAMAGES

The trial court awarded B & M Coal $173,873.09 in damages for injury to property. Appellant correctly argues this amount was excessive.

■ Our standard of review for resolving excessive damages claims is well estab-

---

8. Because of this conclusion we need not address another issue raised by appellants, i. e., whether the trial court should be ordered to amend its judgment to specify which organizational branch of the United Mine Workers the court intended to be held liable.

lished. We may not disturb an award unless it is apparent the amount of damages was so small or great so as to indicate the factfinder was motivated by passion, partiality, corruption or considered some improper element. *Kroger Co. v. Beck*, (1978) Ind.App., 375 N.E.2d 640; *Rondinelli v. Bowden*, (1973) 155 Ind.App. 582, 293 N.E.2d 812. We remand this case for a redetermination of damages because the record conclusively shows consideration of improper elements.

 First of all it is important to note B & M Coal requested $174,034.16 for damage to its property, $1,252,514.68 in lost profits and $54,925.34 for additional security costs incurred after the raid. It is evident, and B & M admits, that the judgment was intended to cover only damage to property. No evidence was presented on the lost profits issue and the trial court apparently, and correctly, determined the security costs were not recoverable. Monetary awards in civil contempt actions are permitted only to repair damage or compensate the plaintiff for injuries incurred. *Smith v. Indiana State Board of Health*, (1973) 158 Ind.App. 445, 303 N.E.2d 50, *cert. denied*, 419 U.S. 836, 95 S.Ct. 63, 42 L.Ed.2d 62; *Denny v. State*, (1932) 203 Ind. 682, 182 N.E. 313. Our inquiry is therefore limited to the damages awarded for injury to property.

 It is readily apparent from the record that the court considered improper elements in its determination of damages. The court's award was only $161.07 less than the amount requested by B & M. Yet the record reveals B & M overstated its claim by thousands of dollars. During cross-examination of Paul Teegarden the following colloquy took place:

"*Question*: Now Mr. Tegarden [sic], the trucks that you replaced here, did these trucks belong to B & M Coal Corporation?

*Answer*: No Sir.

*Question*: Do you recall who they, as I remember correctly, you replaced five (5) trucks, is that right?

*Answer*: Correct.

*Question*: Who did these five (5) trucks belong to?

*Answer*: Three (3) of them belonged to Roger Hebner Trucking Company and two (2) of them belong [sic] to Sam Trucking Company.

*Question*: Did you have these leased from these companies?

*Answer*: Yes.

*Question*: Under the terms of the lease, were you responsible for damages?

*Answer*: Anything not covered by the insurance, that is correct.

*Question*: Did you know whether or not your insurance paid for these vehicles?

*Answer*: Not yet.

*Question*: OK, so you bought Sam's Trucking two (2) new trucks.

*Answer*: Correct.

*Question*: What kind of trucks did he get destroyed?

*Answer*: White Trucks.

*Question*: Were they brand new trucks?

*Answer*: No.

*Question*: So instead of two used trucks, he got two new trucks?

*Answer*: Right.

*Question*: What about Roger Hebner, what kind of trucks did he have?

*Answer*: Mac Trucks.

*Question*: Were they new trucks?

*Answer*: No Sir.

*Question*: How old are they?

*Answer*: A year or two. The ones that were destroyed.

*Question*: You bought him three (3) new trucks?

*Answer*: Correct.

*Question*: Did either Roger Hebner or Sam's Trucking pay you the difference in those trucks?

*Answer*: Not yet, but we hope to collect for them.

*Question*: How much do you think the difference is that you are going to collect?

*Answer*: Well, we haven't arrived at any conclusion yet.

B & M Coal claimed $115,683 for the three new Mack trucks. Although the collateral source rule prohibits consideration of any compensation a plaintiff might receive from sources other than the defendant, *Evans v. Breeden*, (1975) 164 Ind.App. 558, 330 N.E.2d 116, it is also the law that compensation for damage to personal property is measured by the fair market value at the time of the loss. *Daly v. Nau*, (1975) 167 Ind.App. 541, 339 N.E.2d 71. The value of used trucks obviously is less than new trucks and the court therefore erred in computing the "new" value into its damages computations.

Additionally, the record reflects a number of items were improperly included in the total amount requested by B & M Coal. For example, B & M purchased AR–15 rifles and ammunition and included the expense in its damages totals. Also included were costs incurred prior to the January 7 raid. Paul Teegarden testified as follows under cross-examination:

"Q. Can you find the ticket in the amount of $82.89 by Ray Wells?

A. Yes, I have found that.

Q. That is dated 1–3–78?

A. Correct.

Q. Would that be related to the raid of January the 7th?

A. Not on that date.

Q. Would you find the ticket signed by Ray Wells in the amount of $97.63? It is for tire repairs.

A. That is also the same date.

Q. Would that have any relation?

A. Not on that date.

Q. And would you find the ticket dated 1–4–78, in the amount of $10.00, signed by Purdue, I believe it is, for one tire repair?

A. Yes.

Q. Okay, would that be also unrelated?

A. Not on that date, that is correct.

Q. And would you find one signed by Steve someone, in the amount of $32.83? It is dated 1–4–78.

A. Correct, also tire repairs not on that, January the 4th would be before the 7th.

Q. That would be unrelated?

A. Yes, $32.83.

Q. Now, can you find the ticket in the amount of $118.84, signed by L. Jones on 1–5–78?

A. That is correct, tire repairs, too, $118.84, that is January the 5th."

Teegarden's cross-examination overflows with similar testimony that need not be reiterated here.

■■■■ The record patently demonstrates the court's consideration of improper elements in setting the damages award. We therefore remand for further proceedings on this question. In determining the proper amount of damages the court should be guided by a few basic principles. Damages are recoverable in this type of case only for injury directly caused by the contemptuous conduct. *Smith v. Indiana State Board of Health, supra, Denny v. State, supra.* Damage to personal property is measured by the property's fair market value at the time of the loss, *Daly v. Nau, supra.* Fair market value is defined as the price at which a willing seller and willing buyer will trade. *Sikora v. Barney*, (1965) 138 Ind.App. 686, 207 N.E.2d 846. Permanent injury to real property is assessed at the difference between the value of the property before and after the loss, *see Luxurious Swimming Pools, Inc. v. Tepe*, (1978) Ind.App., 379 N.E.2d 992, while the measure of damages for nonpermanent injury to real estate equals the cost of restoration. *Indiana Motorcycle Association v. Hudson*, (1980) Ind.App., 399 N.E.2d 775.

## VI. EVIDENCE OF PRIOR RAIDS

Over the objection of appellants the court admitted evidence concerning previous raids which had occurred at the B & M facility on December 9 and 12. On appeal appellants argue the admission of this testimony was reversible error as it was unduly prejudicial to them.[9] We do not agree.

9. This argument is also advanced with regard to interrogatories which the court ordered appellants to answer.

Indiana law clearly states the admission of evidence of similar acts, occurrences or transactions rests within the discretion of the trial court. *Smith v. Indiana State Board of Health*, (1974) 159 Ind.App. 360, 307 N.E.2d 294; *Murphy v. Indiana Harbor Belt Railroad Co.*, (1972) 154 Ind. App. 103, 289 N.E.2d 167. There is no dispute that the events of December 9 and 12 constitute acts or occurrences similar to the January 7 raid. On December 9 one of B & M's payloaders was pushed into a ditch and Paul Teegarden suffered a fractured wrist and head lacerations when he was assaulted by striking miners. December 12 saw two large convoys of vehicles converge on the B & M Dock and the subsequent arrest of seven miners. The inquiry thus becomes whether the court abused its discretion in admitting the evidence.

*Smith v. Indiana State Board of Health*, *supra*, controls our decision. *Smith* also concerned a contempt proceeding during which evidence of past acts was admitted. The court found no abuse of discretion and said even if there was error it would have been harmless because the case was tried without a jury. Reasoning that a trial court would not be prejudiced by such evidence the court said, "The trial court would properly consider the exhibits and determine their propriety and weight in relation to legal and evidentiary principles. . . . " *Id.* at 297.

Similar to *Smith* we find no abuse of discretion here. The events of December 9 and 12 show an organized pattern of intimidation and violence against B & M Coal. This evidence also supported B & M's arguments concerning appellants' actual knowledge of the restraining orders, discussed in Issue II, *supra*, as the orders were read to the congregated miners by law enforcement officials.

We also agree with the *Smith* decision in that we believe any prejudice to appellants would have been nil given the lack of a jury. The trial judge presumptively knew the rules of evidence and gave the testimony concerning past acts only its proper weight. Appellants' argument that the judge may have been prejudiced because he "was not familiar with any of the parties having had his usual circuit in a county several miles removed from the area in question" is without merit. A judge's knowledge, temperament and ability are not functions of geographic location. There is no error here.

## VII. ARREST CARDS

During the trial the court admitted plaintiff's exhibits 1 through 191 which were arrest cards, made by the Spencer County Sheriff on the night of January 7. Appellants object to the admission of these records on what we perceive to be two grounds: 1) the arrest and subsequent proceedings did not comply with the mandates of Ind.Code 34–4–7–8 [10] and due process, and 2) the police lacked probable cause to make the arrests. Both assertions are unpersuasive.

Ind.Code 34–4–7–8 basically requires an individual who is charged with an indirect contemptuous act must be given notice of the facts giving rise to the charge, an opportunity to be heard and a chance to

---

**10.** "Indirect—Rule to show cause.—In all cases of indirect contempts, the person charged therewith shall be entitled, before answering thereto, or being punished therefor, to have served upon him a rule of the court, against which the alleged contempt may be committed; which said rule shall clearly and distinctly set forth the facts which are alleged to constitute such contempt; and shall specify the time and place of such facts with such reasonable certainty, as to inform the defendant of the nature and circumstances of the charge against him; and shall specify a time and place at which he is required to show cause, in said court, why he should not be attached and punished for such contempt, which time the court shall, on proper showing, extend so as to give the defendant a reasonable and just opportunity to purge himself of such contempt. No such rule as hereinbefore provided for, shall ever issue until the facts, alleged therein to constitute such contempt, shall have been brought to the knowledge of the court by an information, duly verified by the oath of affirmation of some officer of the court, or other responsible person."

purge himself of the contempt. These requirements were fully complied with. On the night of their arrests appellants were detained only long enough to permit identification and attendant processing by the police. They were released that same night and subsequently served with the required Rule to Show Cause documents. Trial was held on March 7, 1978, and appellants therein fully and completely presented their version of the case. There was no violation of the statute.

 Similarly we perceive no violation of due process in these events. Due process requires that a civil contemner be provided basic protections, i. e., adequate notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Fisher v. Marubeni Cotten Corp.* (1975 8th Cir.) 526 F.2d 1338. In *Altemose Construction Co. v. Building and Construction Trades Council of Philadelphia*, (1972) 449 Pa. 194, 296 A.2d 504, *cert. denied* 411 U.S. 932, 93 S.Ct. 1901, 36 L.Ed.2d 392, strikers were arrested, imprisoned without bail and brought before a judge in a summary proceeding without adequate notice of charges or time to prepare a defense. The court found a clear violation of due process. The case before us is vastly different from *Altemose*. In indirect contempt actions brief detention solely for purposes of identification where adequate notice and opportunity to be heard are subsequently provided does not violate due process. *See Jim Walter Resources, Inc. v. Local Union No. 12014*, (1978) Ala., 356 So.2d 640.

 Appellants also argue the arrest cards were inadmissible as the fruit of an illegal arrest. They argue the arrests were warrantless and there was no showing of probable cause. Appellants overlook the fact they were arrested for illegal acts committed in the presence [11] of police officers. A warrant was therefore unnecessary. *Britt v. State*, (1979) Ind.App., 395 N.E.2d 859; *Gilman v. State*, (1979) Ind.App., 389 N.E.2d 327. Additionally, the officers had probable cause to make the arrests. The test for probable cause in this situation is

whether facts and circumstances known to the officer were sufficient to warrant a reasonably prudent man in believing the arrestee was committing an illegal act. *Kizer v. State*, (1979) Ind.App., 395 N.E.2d 841. The officers unequivocally testified they observed the convoys arrive, men leave their vehicles and extensively vandalize B & M's property. There was more than ample probable cause to arrest appellants.

## VIII. IDENTITY OF INFORMANT

Much of the information Paul Teegarden received prior to the raid on the B & M Coal Dock came from an informant. On cross-examination Teegarden was asked to name the informant and the court sustained an objection to the question. Appellants assign the nondisclosure of the informant's identity as error. We do not think the court erred.

 Indiana law generally favors nondisclosure of an informant's identity particularly where disclosure might risk the safety or life of the informant. This is not an absolute policy, however, and the informant's identity may be revealed if the defendant can show disclosure is essential to a fair determination, unless a paramount interest in nondisclosure or unwarranted danger to the informant is shown. *Miller v. State*, (filed April 28, 1980) Ind.App. No. 2–479 A 90; *Mills v. State*, (1978) Ind.App., 379 N.E.2d 1023; *Lewandowski v. State*, (1978) Ind.App., 374 N.E.2d 566, *rev'd on other grounds*, (1979) Ind., 389 N.E.2d 706.

 Given these criteria, the court properly prohibited disclosure of the informant's identity. Appellants claim the identity of the informant was needed so he could be questioned regarding the information he relayed to Teegarden. They claim this evidence was "extremely critical" to the court's finding of a violation of the restraining orders. We do not agree. The evidence, absent the informant's information was more than sufficient to support this finding, as we discussed in Issue IV. Even if we were to accept this aspect of appellant's argument, however, the violent

---

11. "Presence" in this context means the officers knew of the illegal acts by use of their

senses. *See State v. Smith*, (1962) 37 N.J. 481, 495, 181 A.2d 761, 768.

emotions and volatile atmosphere which surrounded the coal strike would have justified a determination of "unwarranted risk" to the life of the informant. *Lewandowski v. State, supra.*

■ Appellants argue tangentially that this testimony was inadmissible hearsay. No such objection was raised at trial or in the Motion to Correct Error and this assertion was thereby waived. *Robinson v. State,* (1979) Ind.App., 389 N.E.2d 371; A.R. 8.3(A)(7). Nevertheless, we point up this evidence was not hearsay to the extent it was used for the limited purpose of explaining the actions of Paul Teegarden and the B & M employees prior to the raid. The testimony was admissible not to prove the truth of the facts asserted, *Patterson v. State,* (1975) 263 Ind. 55, 324 N.E.2d 482, but to show the effect on the hearer. *See* McCormick, Evidence 589–90 (1972).

## XI. PHOTOGRAPHIC DISPLAYS

■ The final issue concerns the identification of Stephen Bottoms as the man who damaged two trucks leased to B & M Coal. Bottoms claims the photographic displays from which the drivers of the two trucks identified him were unnecessarily suggestive. Indiana law is to the contrary.

The drivers of the trucks, Lee Steele and Rick McDonald, each selected Bottoms' picture from a group of photographs shown them separately by the Spencer County Sheriff. Steele made his selection from approximately 200 photographs; McDonald was shown nine. Bottoms claims the method of selection employed by the sheriff was suggestive but fails to point to any specific evidence of suggestiveness. The mere fact that McDonald went to the station to view the photographs a day or two after Steele proves nothing. Moreover, Indiana case law has consistently found photographic display similar to, or more suggestive than, the one employed here to fall short of the "unnecessarily suggestive procedures which give rise to a substantial likelihood of irreparable misidentification" standard. *See Manson v. Braithwaite,* (1977) 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140; *Simmons v. United States,* (1968) 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247; *Rogers v. State,*

(1979) Ind., 396 N.E.2d 348. The following cases have held photographic displays were not unnecessarily suggestive: *Gaddis v. State,* (1977) 267 Ind. 100, 368 N.E.2d 244 (defendant's photo smaller than other six photos); *Whitt v. State,* (1977) 266 Ind. 211, 361 N.E.2d 913 (defendant's photo only one of seven which showed front and profile views of subject); *Beacham v. State,* (1975) 166 Ind.App. 341, 336 N.E.2d 404 (defendant's photo only one of five which pictured a height chart and showed front and profile views). In light of this overwhelming precedent we cannot find the use of the photographic displays improper.

■ Even if we were to find the displays unnecessarily suggestive, we could not accept Bottoms' claims of insufficient evidence of identification. Our Supreme Court has adopted the "independent basis" test of in-court identification. Justice Hunter described this test thusly: "Regardless of any suggestiveness involved in the pretrial [identification procedure], the trial court is correct in refusing to suppress the in-court identification testimony of the victim if the court can properly find that such testimony is supported by a basis independent from the pretrial procedure considering the objective circumstances of each case." *Young v. State,* (1979) 395 N.E.2d 772, 775.

In this case both McDonald and Steele identified Bottoms in court as the person who damaged their trucks. Both men also testified they observed Bottoms up close as he beat on their respective trucks and person with a baseball bat and set of numbchucks. There was thus a substantial basis, independent of the photographic displays, upon which to base the identification of Bottoms as the perpetrator of the contemptuous act.

The judgment against the United Mine Workers is reversed. The judgment against the 191 individuals is reversed insofar as it orders incarceration and remanded for a redetermination of damages; in all other respects it is affirmed. The judgment against Stephen Bottoms is affirmed, except to the extent it orders incarceration.

MILLER, P. J., and YOUNG, J., concur.