LOCAL UNION NO. 115 and Local Union No. 501, Each of the American Flint Glass Workers Union of North America, AFL–CIO, et al., Appellants–Defendants,

v.

### INDIANA GLASS COMPANY, Appellee–Plaintiff.

No. 38A02–0111–CV–730.

Court of Appeals of Indiana.

July 22, 2002.

William R. Groth, Geoffrey S. Lohman, Fillenwarth Dennerline Groth & Towe, Indianapolis, IN, Attorneys for Appellants.

Steve Shoup, Jan J. Kinzie, Lowe Gray Steele & Darko, LLP, Indianapolis, IN, Attorneys for Appellees.

## OPINION

BAKER, Judge.

Appellants-defendants Local Union 115 and Local Union 501, each of the American Flint Glass Workers Union of North America, AFL–CIO, and three of their officers—Ronald Fuller, Sonny Poor, and Clark Anderson—(collectively, the local unions) appeal the entry of a permanent injunction restricting them from certain strike and picket activities in their labor dispute with the appellee-plaintiff Indiana Glass Company (Indiana Glass). Concluding that Indiana Glass' complaint satisfied the Anti–Injunction Act's pleading requirements and finding that the trial court's challenged findings were supported by the evidence, we affirm.

### FACTS

The local unions were jointly negotiating for a collective bargaining agreement with Indiana Glass during early fall 2001. On October 8, a few days after negotiations broke down, the local unions began to strike. Sometime during the first night of the strike, two strikers walked up to the plant manager responsible for security, Kevin Heuser, and spat on him after pretending to call a truce. That same evening Heuser noticed a red laser light (similar to ones used for gun sights) trained in the window of the room he was in. The red laser light originated from an area just behind the local unions' recreational vehicle parked across the street from the plant. Although he did not see the person pointing the light in his direction, Heuser noticed several strikers milling about the RV and drinking alcohol.

The local unions began picketing in earnest the next day at four main locations. Some picketers were stationed outside the main gates of the plant, while separate contingents were dispatched to two Indiana Glass retail facilities located in Muncie and Dunkirk. A fourth group congregated at the intersection of Pleasant and Main Streets in Dunkirk, along a route necessary for shipments to and from the plant. This intersection is only 100 to 150 yards away from the union hall shared by both unions and is clearly visible from inside the union hall.

On the first day of picketing, at least 50 strikers blocked the intersection as a tractor-trailer and a security escort vehicle, driven by Robert Landess, were en route to the factory. Some of the picketers jumped onto the front of the tractor-trailer and beat on it, warning the truck driver and Landess that they had "better not go" to the plant. Tr. p. 38. Twenty of the picketers stopped the truck, cut the brake lines, and punctured one of the tires. The rest of the group pounded on Landess's escort vehicle, shattering the back window.

Officer Dane Mumbower of the Dunkirk Police Department was dispatched to the scene. When he arrived, he witnessed between fifty to sixty strikers at the intersection, one of whom was hanging from the tractor-trailer's mirror. As the picketers somewhat dispersed, Officer Mumbower spoke to the driver of the tractor-trailer but neglected to take a statement from him. While Officer Mumbower was speaking with the truck driver, twenty picketers yelled, "Let's trash their car!" and rushed toward Landess's escort vehicle. Tr. p. 37. Landess managed to speed off before the picketers could get to him.

Later the same day, Heuser drove an escort vehicle for a tractor-trailer leaving the plant. As soon as Heuser stopped at the Main and Pleasant Streets intersection, picketers surrounded his vehicle. At first, they placarded his front and side windows with picket signs and threw a sheet over his car. Heuser then opened the car door to make sure the truck driver was unharmed and attempted to film the scene with a video camera. Picketer Betty

Jones slammed the car door against Heuser's leg. As he pushed the door open, another picketer kicked him in the face. Heuser was jerked from the car and repeatedly kicked and punched. As a result of the beating, Heuser suffered two hematomas to his head, three broken teeth, a twisted jaw, a nose injury, bruised ribs, and a hernia.

Jay County Sheriff Todd Penrod arrived at the scene as Heuser and the tractor-trailer came to a stop at the intersection. He had just served a temporary restraining order on the local unions' representatives and was driving through Dunkirk on his way back to the Jay County Sheriff's Department in Portland. He witnessed the sheet being thrown onto Heuser's vehicle and saw a woman hitting Heuser's vehicle with a picket sign. Sheriff Penrod did not see the subsequent assault and did nothing to investigate it once Heuser reported his injuries to him. Sheriff Penrod, however, called the Dunkirk Police Department, which "took over" the investigation. Tr. p. 160.

Shortly thereafter, Dunkirk Police Department Chief Arnold Clevenger and Officer Mumbower arrived at the scene. Chief Clevenger went to the union hall and told Poor that they "need to put a stop to it for the night." Tr. p. 110. Poor, Fuller, Anderson, and a national representative of the local unions, Andrew Slipp, went to the intersection and dispersed the crowd. While at the scene, Slipp saw Heuser and stated, "Oh, you're the one that wouldn't talk to me? You got what you deserved." Tr. p. 20.

There were other incidents of picketers interfering with shipments to and from the plant and threatening security guards, and harassing Indiana Glass retail outlet patrons. One truck driver required medical attention when a picketer threw a concrete rock through the driver's side window. During another incident, the picketers stationed at the Indiana Glass retail outlet in Muncie scattered over four hundred nails in the parking lot and temporarily blocked people from entering or leaving the parking lot. One picketer copied down a security escort's license plate number and threatened to kill him. On another occasion, a security escort spotted a man dressed completely in black crouched behind bushes near the Pleasant and Main Street intersection. The man was aiming a crossbow in his direction.

There was evidence that the local unions could guarantee the safe passage of certain shipments to and from the plant when it suited their purposes. First, Slipp sent a letter to Indiana Glass assuring the company that a FedEx truck could "proceed unimpeded into the Indiana Glass facilities" so that Indiana Glass could provide the strikers their paychecks. Plaintiff's Ex. 3. Slipp concluded his letter by recommending that Indiana Glass make the paychecks available at the "normal time" or the "already tense situation would not be improved if employees felt that the company was withholding or toying with their checks." Plaintiff's Ex. 3. Second, three businessmen asked Fuller what the local unions would do to insure that school children could safely go through town after school. Fuller assured them that the school children could do so "without incident." Tr. p. 267. Fuller testified, "[W]hile I was there ... a truck came through, and we told the police that if any trucks came through during the time that there was any children coming, that they would go through, and Arnold Clevenger was present as the kids were walking through, and a truck went through without any incident." Tr. p. 269.

Indiana Glass filed a complaint for a temporary restraining order and a permanent injunction, setting forth the following:

8. That unlawful acts are being committed, have threatened, and will be committed unless restrained and have been committed and will continue unless restrained, to-wit: that members and agents of Defendants, Local Union No. 115 and Local Union No. 501, American Flint Glass Workers Union of North America, AFL–CIO, are presently, have in the past and have threatened to continue to block legal ingress and egress to Plaintiff's plant located as above described; that said members and agents of Local Union No. 115 and Local Union 501 have harassed and intimidated persons who have removed products, manufactured goods and supplies from Plaintiff's plant; that the aforesaid agents and members of Local Union 115 and Local Union 501 have harassed and intimidated non-picketing, non-striking and non-union employees of Plaintiff upon said persons attempting to enter the aforesaid plant of Plaintiff to report for work; that said agents and members of Local Union 115 and Local Union 501 are presently physically blocking entrances to Plaintiff's plant and have attempted to prevent other persons from legally entering the Plaintiff's premises. That such unlawful acts have also been committed by said Union members wh[o] have caused physical damage to property and have attempted physical harm to individuals and property and have attempted physical harm to individuals and property of customers and employees of the Plaintiff.

9. That substantial and irreparable injury to Plaintiff's property will follow if said restraining order and injunction are not issued.

10. That as to each item of relief requested, greater injury will be inflicted upon Plaintiff by the denial of relief than will be inflicted upon Defendants by the granting of relief.

11. That Plaintiff has no adequate remedy at law.

12. That the public officer charged with the duty to protect Plaintiff's property and rights is unable to furnish adequate protection.

13. That unless a temporary restraining order shall be issued without notice, substantial and irreparable injury to Plaintiff's property will be unavoidable. That failure to issue a temporary restraining order without notice may result in bodily harm and property damage to Plaintiff, uninvolved third parties and the public in general and has continued to persist despite the efforts of local law enforcement officers.

Appellants' App. p. 14–15.

The trial court granted the Temporary Restraining Order and set a hearing for the permanent injunction request. In turn, the local unions filed a motion to dismiss Indiana Glass' complaint for non-compliance with Indiana's Anti–Injunction Act. After a full hearing, the trial court ordered a permanent injunction, effectively denying the motion to dismiss. The trial court's order was accompanied by findings of fact and conclusions of law. The local unions now appeal the entry of permanent injunction and denial of their motion to dismiss.

## DISCUSSION AND DECISION

### I. Mootness

By its own terms, the permanent injunction was to remain in full force and effect for only six months after October 18, 2001. Appellants' App. p. 11. The trial court left open the possibility of extending the permanent injunction for an additional six months at a hearing upon good cause shown where all parties would have an opportunity to be heard. Appellants' App. p. 11. The local unions filed their notice of

appeal on October 29, 2001. On January 14, 2002, the Associated Press reported that the strike had been settled when union members voted to ratify a new three-year contract. Associated Press, *Strike at Dunkirk Glass Plant Ends*, Jan. 14, 2002, LEXIS, Nexis Library, News Group File.

■ Given that the strike was settled and the injunction had dissolved by its own terms, this court was inclined to deem the appeal moot and dismiss it. Accordingly, we issued an order requesting that the parties show cause for the continuation of the appeal. *See Local Union No. 115 v. Indiana Glass Co.*, 38A02–0111–CV–730 (Ind. Ct.App. June 19, 2002) (order to show cause why appeal should not be dismissed as moot). Indiana Glass responded that indeed the strike had been settled and that the injunction had dissolved by its own terms. Indiana Glass, as a result, believed that dismissal of the appeal was proper. Appellee's Response to Show Cause Order p. 1.

■ The local unions, on the other hand, appropriately noted that this case is not moot. "An appeal or issue becomes moot ... 'when the parties lack a legally cognizable interest in the outcome.'" *In re Tina T.*, 579 N.E.2d 48, 52 (Ind.1991) (quoting *Roark v. Roark*, 551 N.E.2d 865, 867 (Ind.Ct.App.1990)). Whenever a party seeks a labor injunction, it is required to post a bond "sufficient to recompense those enjoined for any loss, expense, or damage caused by the improvident or erroneous issuance of such order or injunction, including all reasonable cost (together with a reasonable attorney's fee) and ex-

pense of defense against the order." Ind. Code § 22–6–1–6(d). In the instant case, Indiana Glass did provide a bond in accordance with the statute. Appellants' Response to Court's Order to Show Cause p. 3. We agree that if the injunction were erroneously granted, crucial issues regarding damages—for example, which party will bear responsibility for the attorneys fees—would be welcome to additional judicial resources and attention. This, despite the fact that the strike is dead, the local unions have a new contract, and the injunction has long since dissolved.[1] Because the parties have a legally cognizable interest in the legitimacy of the injunction, we address the issues on their merits.

Continuing their challenge of the injunction, the local unions bring three main contentions of error, one procedural, the other two substantive. The first contention we address is whether Indiana Glass' complaint for a temporary restraining order and permanent injunction is sufficient to confer subject matter jurisdiction on the trial court. The second and third contentions involve whether the evidence supported two of the trial court's main findings as required by Indiana's Anti-Injunction Act.

## II. Subject Matter Jurisdiction

■ The local unions argue that Indiana Glass failed to comply with pleading requirements set forth in the Anti-Injunction Act. As a result, they maintain, the trial court lacked subject matter jurisdiction to enter a permanent injunction against them.

---

1. Other jurisdictions have arrived at similar conclusions. *See Giant Eagle Mkts. Co. v. United Food & Commercial Workers Union, Local Union No. 23*, 539 Pa. 411, 652 A.2d 1286, 1291 (1995) (holding that appeal was not moot under Pennsylvania's Anti-Injunction Act, even though strike had ended, because an erroneously granted injunction would give rise to damages); *Teamsters Local No. 783 v. Nat'l Linen Serv. No. 63*, 472 S.W.2d 671, 674 (Ky.1971) (holding that case was not rendered moot because "a genuine judicial controversy" existed "as to the right of the appellants to recover costs, attorneys' fees and damages for the period during which the strike ... was in effect").

To address this claim, we briefly review pleading practices before and after the passage of the Anti–Injunction Act. At common law, organized labor activity was classified either as a "criminal conspiracy" or as a "'prima facie tort,'" such as a nuisance, conspiracy, or interference with trade and business. *State ex rel. Taylor v. Circuit Court of Marion County,* 240 Ind. 94, 98, 162 N.E.2d 90, 91–92 (1959). Formerly, an employer was required only to file a complaint alleging a nuisance when his employees engaged in picketing, striking, or boycotting. *See id.* Indiana's Anti–Injunction Act (Indiana Code sections 22–6–1–1 to –12) was enacted to minimize "judicial control over conduct related to labor disputes." *Int'l Ass'n of Machinists & Aerospace Workers, Local No. 1227 v. McGill Mfg. Co.,* 164 Ind.App. 321, 325, 328 N.E.2d 761, 764 (1975). More specifically, the Anti–Injunction Act "place[d] limitations upon the jurisdiction of courts to grant injunctions in such cases." *Roth v. Local Union No. 1460 of Retail Clerks Union,* 216 Ind. 363, 368, 24 N.E.2d 280, 282 (Ind.1939). Now when an employer requests an injunction of activity related to a "labor dispute," "a complex set of procedural requirements ... strictly circumscribe the equity jurisdiction of trial courts." *McGill Mfg. Co.,* 164 Ind.App. at 325, 328 N.E.2d at 764.

■ One of those procedural requirements is the filing of "allegations of a complaint made under oath ... to the effect":

(1) that unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, but no injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the person or persons, association, or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof;

(2) that substantial and irreparable injury to complainant's property will follow;

(3) that as to each item of relief granted injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;

(4) that complainant has no adequate remedy at law; and

(5) that the public officer charged with the duty to protect complainant's property is unable or unwilling to furnish adequate protection.

I.C. § 22–6–1–6(a). A complaint for permanent injunction must comply with this statutory requirement "otherwise the court is without jurisdiction" to issue an injunction. *State ex rel. Taylor,* 240 Ind. at 100, 162 N.E.2d at 93.

How does a complaint for a permanent injunction comply with the Anti–Injunction Statute? The local unions maintain that Indiana Glass is required to "specifically plead all of the facts supporting the required elements of Ind.Code § 22–6–1–6." Appellants' Br. p. 25. Indiana Glass, on the other hand, argues that it need only allege the elements of section 6 in its complaint to satisfy the jurisdictional requirement for pleading under the Act.

■ Under section 6, "a plaintiff seeking injunctive relief must affirmatively invoke the court's jurisdiction by a verified complaint which alleges all of the factual assertions enumerated by the statute." *McGill,* 164 Ind.App. at 327, 328 N.E.2d at 765. "The particularized pleading requirements of special statutory proceedings constitute a recognized exception to the liberal 'notice pleading' standard of" Rule 8(A) of the Indiana Rules of Trial Procedure. *Id.* at 327, 328 N.E.2d at 765. To obtain an injunction:

[T]he petition for relief must be supported by a complaint alleging: (1) the commission or threat to commit unlawful acts; (2) substantial and irreparable injury to the complainant's property; (3) denial of relief will inflict more harm on the complainant than a grant of relief will inflict upon defendant; (4) complainant has no adequate remedy at law; and (5) the public officer responsible for protecting complainant's property is unable or unwilling to furnish adequate protection.

*Pompey v. Pryner,* 668 N.E.2d 1243, 1248 (Ind.Ct.App.1996). In *Pompey,* we held that the complaint did not comply with section 6(a)'s jurisdictional requirements because it "failed to allege [elements] (3)–(5)." *Id.* The first element, by implication, was sufficiently alleged by the following: the employee had " 'threatened physical violence against Pompey and other employees and representatives of [the Company.]' " *See id.* at 1247 (alteration in original). In other words, we did not require that the company "specifically plead all of the facts supporting the required elements of" section 6(a), as the local unions urge us to do here. If we had relied on such an interpretation in *Pompey,* then the company would have been required to specifically plead each instance of threatened violence to satisfactorily support element (1) of section 6(a) as well as elements (3) through (5).

The local unions rely heavily on the specific pleading requirements of Ind. Trial Rule 9 for support of their argument. To properly plead fraud or mistake, for instance, "the circumstances constituting fraud or mistake, shall be specifically averred." T.R. 9(B). But no portion of section 6 requires a party to specifically aver the circumstances supporting each of the five elements. Rather, the Act requires "allegations of a complaint ... to the effect" that each of the elements is present. I.C. § 22–6–1–6(a). Therefore,

drawing on the text of section 6 and relevant case law, we believe the allegations of Indiana Glass' complaint satisfied the pleading requirements of section 6.

### III. Challenged Findings

The local unions also challenge two of the trial court's findings in support of the injunction. They first argue that the findings do not support the conclusion that the local unions' leadership had authorized or ratified the unlawful acts. The local unions further maintain that the evidence does not support the findings that the public officers charged with the duty to protect Indiana Glass' property are unable or unwilling to offer adequate protection.

According to Indiana's Anti–Injunction Act, a trial court has jurisdiction to issue a permanent injunction in a case involving a labor dispute only after it makes special findings enumerated in the Act. I.C. § 22–6–1–6; *see also McGill Mfg. Co.,* 164 Ind.App. at 327, 328 N.E.2d at 765 ("The trial court must also enter specific findings of fact which clearly disclose the existence of each of the factual elements enumerated in [the Anti–Injunction Act]."). On appeal, the findings and judgment may not be set aside "unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). In our review, we first consider whether the evidence supports the factual findings. *Menard, Inc. v. Dage–MTI, Inc.,* 726 N.E.2d 1206, 1210 (Ind.2000). We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Shell Oil Co. v. Meyer,* 705 N.E.2d 962, 972 (Ind.1998). Second, we consider whether the findings support the judgment. *Menard, Inc.,* 726 N.E.2d at 1210.

## A. Authorization or Ratification of Unlawful Acts

The local unions claim that the trial court's findings supporting the first element of section 6(a)—the unlawful-acts element—are clearly erroneous. According to the unlawful-acts element, "no injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the person or persons, association, or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof." I.C. § 22–6–1–6(a)(1). They stress that no evidence supports a finding that the local unions authorized or ratified the unlawful acts committed by members of the local unions. Therefore, according to the local unions, only individual members who committed the unlawful acts should have been enjoined, not the unions themselves.

 A union may be held liable for the acts of individual members only according to traditional doctrines of agency. *See Bottoms v. B & M Coal Corp.*, 405 N.E.2d 82, 90 (Ind.Ct.App.1980) (citing *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). The presence of union officers or union employees during instances of unlawful acts committed by individual members may give rise to liability of the organization, not just of the individual members. *See id.* ("[N]o union officers or employees were arrested or, as far as can be determined, even present during the activities at B & M Coal. . . ."). This court in *Bottoms* held that the union organization itself could not be held liable for the destruction of a mining company's property, committed by 191 of its members, because there was no evidence that any union officers or union employees were present during the raid. *Id.* at 90–91.

 In the instant case, however, union officers were stationed near the location where the repeated unlawful acts took place. The evidence showed that the union hall, shared by the leadership of both unions, was only 100 to 150 yards (a half block) away from the scene of multiple violent confrontations between union members and Indiana Glass security escorts and trucks. The intersection of Pleasant and Main Streets was clearly visible from inside the union hall, and officers were in the hall when the violence occurred. The union officers do not dispute that they were aware of the confrontations. In fact, the union officers were able to disperse fifty to sixty picketers after being asked to do so by a Dunkirk police officer.

In addition to the union leadership's presence near the violent confrontations, one of the union's national representatives approved of the beating an Indiana Glass employee received at the hands of the strikers. Slipp told an Indiana Glass manager, who had been severely beaten by union members, that he had gotten what he deserved for not talking to him. Tr. p. 20.

Finally, there was evidence that the union leadership could guarantee the safe passage of shipments to and from the factory, when it suited the local unions' interests. In one instance, the union leadership assured the safety of a FedEx truck delivering paychecks to Indiana Glass. In another instance, the local union leadership promised that trucks could proceed unharmed if children leaving school were nearby.

While the union officers may have publicly condemned the violence, one might reasonably infer that the union officers ratified the unlawful conduct given the repeated violence within clear view of their headquarters, Slipp's remark to a severely beaten Indiana Glass Manager that he

had gotten what he deserved for not talking to the local unions, and their ability to guarantee safe passage of trucks at certain times. These evidentiary facts support the trial court's finding that officers of the local unions allowed members to congregate at the intersection despite ongoing unlawful acts occurring at that location. Appellants' App. p. 9. In turn, this special finding, supported by the above evidentiary facts, was sufficient to support the conclusion that unlawful acts had been committed and would continue to be committed by the local unions themselves not just individual members. Appellants' App. p. 9.

### B. Adequate Protection

■ The local unions also challenge the trial court's finding that the police were unable or unwilling to adequately protect Indiana Glass' property. The entire finding appears as follows:

> That the public officer charged with the duty to protect complainant's property is unable or unwilling to furnish adequate protection.
>
> a. Both the city police department and the sheriff's department acknowledge that they have insufficient resources to prevent the unlawful acts complained of.
>
> b. Neither department has made any arrest.
>
> c. No other agency (Indiana State Police) is available to assist.

Appellants' App. p. 10. As noted above, the inadequate-protection finding is one of five elements required by the Anti–Injunction Act. I.C. § 22–6–1–6(e). The purpose of the inadequate-protection element is to prevent courts from " 'tak[ing] over the functions of the executive department and undertak[ing] to police their districts.' " *McGill Mfg. Co.*, 164 Ind.App. at 330, 328 N.E.2d at 767 (alterations added) (quoting S.Rep. No. 163, at 21 (1932)).

The local unions maintain that the trial court's inadequate-protection finding is unsupported by the evidence. The record shows otherwise. First, both law enforcement agencies charged with protecting Indiana Glass's property requested assistance from the Indiana State Police. Sheriff Penrod of the Jay County Sheriff's Department responded affirmatively when asked if he had "filed a written request with the Indiana State Police requesting assistance *to quell the violence* in the City of Dunkirk." Tr. p. 161 (emphasis added). The Indiana State Police made no response to his request. Tr. p. 161. One may reasonably infer from his request that Sheriff Penrod believed he had inadequate resources to protect Indiana Glass's property.

Chief Clevenger of the Dunkirk Police Department testified similarly:

Q: You believe that if you had some more assistance, though, you might have someone there who could witness that?

A: If we had a large department where we could detail somebody to stay right there all the time, yes.

Q: Do you believe that's the only way to keep peace and keep down these incidents?

A: Yes.

Tr. p. 107–08. Within twenty-four hours of the strike, Chief Clevenger filed a written request for assistance from the Indiana State Police. Tr. p. 105. Chief Clevenger acknowledged that his department did not "have enough manpower" to protect trucks and security vehicles going to and from Indiana Glass property. Tr. p. 107. Complaints about vandalism were so frequent that he did not have time to handle his caseload. Tr. p. 104. He estimated that at least eight vehicles, including Indiana Glass escort vehicles, had been damaged during the strike. Tr. p. 107.

Concurring in Chief Clevenger's assessment, Mayor Thomas B. Johnson of Dunkirk testified that the police department was understaffed. Tr. p. 88. Only four officers were available to serve a population of 3,000 citizens. Tr. p. 88. This evidence was sufficient to support the trial court's finding of inadequate police protection.

### CONCLUSION

In conclusion, though the strike had settled and the injunction had dissolved, the local unions correctly argued that the appeal was not moot. However, Indiana Glass' complaint satisfied the pleading requirements of Anti–Injunction Act, and the trial court's challenged findings were supported by the evidence. Therefore, we affirm the trial court's entry of injunctive relief and its denial of the local unions' motion to dismiss the complaint.

Affirmed.

SULLIVAN, J., and DARDEN, J., concur.